STATE OF LOUISIANA       *       NO. 2024-KA-0820

VERSUS       *

      **COURT OF APPEAL**

CARDELL A. HAYES       *

      **FOURTH CIRCUIT**

      *

      **STATE OF LOUISIANA**

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 528-975, SECTION "H"
Honorable Camille Buras, Judge
* * * * * *
**Judge Daniel L. Dysart**
* * * * * *

(Court composed of Judge Daniel L. Dysart, Judge Paula A. Brown, Judge Rachael D. Johnson)

Jason R. Williams, District Attorney
Brad Scott, Chief of Appeals
ORLEANS PARISH DISTRICT ATTORNEY'S OFFICE
619 South White Street
New Orleans, LA 70119

     COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Jane Hogan
HOGAN ATTORNEYS
310 N. Cherry Street, Suite 1
Hammond, LA 70403

     COUNSEL FOR DEFENDANT/APPELLANT

        **AFFIRMED**

        **DECEMBER 16, 2025**

DLD
PAB
RDJ

In this criminal appeal, the defendant, Cardell A. Hayes, seeks review of his conviction and sentence for manslaughter. For the reasons that follow, we affirm the defendant's conviction and sentence.

**STATEMENT OF CASE**

On April 28, 2016, the state filed a true bill indicting defendant with one count each of aggravated criminal damage to a vehicle, aggravated assault with a firearm, attempted second degree murder, and second degree murder,[1] violations of La. R.S. 14:55, 14:37.4, 14:(27)30.1, and 14:30.1, respectively.[2] The next day, defendant appeared for arraignment, entered pleas of not guilty. On December 11, 2016, following a five-day trial, the jury rendered a non-unanimous verdict of guilty, by votes of ten to two, of the lesser included offenses of manslaughter and attempted manslaughter, and unanimously found him not guilty of aggravated criminal damage to a vehicle. On April 20, 2017, the court sentenced defendant to serve fifteen years imprisonment at hard labor on the charge of attempted

---

[1] Defendant was charged with the murder of former New Orleans Saints player William Smith (the victim) and the attempted murder of the victim's wife, Raquel Smith.

[2] The state severed the charge of aggravated assault with a firearm from the indictment on December 6, 2016, and it was subsequently dismissed on July 28, 2017.

1

manslaughter, and twenty-five years imprisonment at hard labor on the charge of manslaughter, both sentences to be served concurrently, and without the benefit of probation, parole, or suspension of sentence, as provided by the firearm sentencing enhancement under the version of La. C.Cr.P. 893.3(E) that was in effect in 2016.

While this Court affirmed defendant's convictions and sentences on direct appeal, and the Supreme Court denied writs, defendant subsequently sought direct review in the United States Supreme Court, which granted certiorari; vacated the judgment; and remanded the case to this Court for further consideration in light of *Ramos v. Louisiana*, 590 U.S. 83, 140 S.Ct. 1390, 206 L.E.d.2d 583 (2020) and *State v. Hayes*, 2017-0789, p. 40 (La. App. 4 Cir. 3/27/19), 315 So.3d 225, 249, *writ denied,* 2019-00808 (La. 3/9/20), 294 So.3d 485, and *cert. granted*, *judgment vacated*, ___ U.S. ___, 141 S.Ct. 1040, 208 L.Ed.2d 513 (2021). On remand, this Court vacated defendant's convictions and sentences and remanded the case to the district court for further proceedings. *State v. Hayes*, 2017-0789, p. 1 (La. App. 4 Cir. 2/19/21), 315 So.3d 251, 252.

On March 4, 2021, the state declared it would proceed against defendant on the charges of manslaughter and attempted manslaughter. Defendant was released on bond on March 18, 2021, under home incarceration. On January 4, 2024, the state filed a motion *in limine*, to, *inter alia*, exclude evidence of the victim's dangerous character, which the district court granted on January 17, 2024. Also, on January 17, 2024, defendant filed a motion to quash the indictment or in the alternative to introduce written summaries of witness statements due to the state's failure to turn over the recorded audio statements of four witnesses. The district court held a hearing the same day and, following extensive oral argument, denied the motion to quash the indictment and took defendant's alternative motion to

2

introduce written summaries of the witness statements under advisement. Prior to calling the first witness on January 23, 2024, the district court granted defendant's alternative motion to introduce the written summaries of previously-recorded witness statements. On January 25, 2024, defendant moved for a mistrial after the district court dismissed juror four and replaced her with an alternate, which the district court denied. Trial concluded on January 26, 2024, and the jury returned a unanimous verdict of guilty of manslaughter, and not guilty of attempted manslaughter.

On April 18, 2024, defendant filed motions for a post-verdict judgment of acquittal; for downward departure from the mandatory minimum sentence; for a new trial; and to quash the firearm sentencing enhancement. Following oral argument on April 25, 2024, the district court denied all of defendant's post-trial motions; defendant waived sentencing delays and the district court imposed a sentence of twenty-five years imprisonment at hard labor, with twenty years to be served without the benefit of parole, probation, or suspended sentence, pursuant to the firearm enhancement, and with credit for all time served, including home incarceration. The state objected to issuing credit for time served under home incarceration, and filed a motion to correct the illegal sentence on April 30, 2024. On July 23, 2024, the district court granted the state's motion, and amended defendant's sentence to twenty-two years and two months imprisonment at hard labor, with twenty years to be served without the benefit of parole, probation, or suspended sentence, pursuant to the firearm enhancement, and with applicable credit for time served.

Defendant filed a motion for appeal on May 7, 2024, which was granted by the district court on July 23, 2024.

3

**FACTUAL BACKGROUND**

Christopher McGaw testified that he was employed as an NOPD police officer in April of 2016, and that he was off duty at the time of the incident. McGaw testified that he was on the outside patio of the Half Moon Restaurant, located at the intersection of St. Mary and Sophie B. Wright Streets when he heard the distinct sound of "a motor vehicle accident…and then a screaming match started, and it started to sound like it was getting rapidly out of control." Although off duty at the time, he decided to approach the scene and intervene. McGaw testified, "I had pulled out my phone and called 911 at some point. While I was walking up the street, I heard staccato-like pop-pop-pop-pop-pop-pop of gunfire and I ducked into an alley that's down the—down the way a little bit."

McGaw testified that once the gunfire ceased, he approached the scene, which he described as follows:

> It was three vehicles nose to tail…a big hummer, a G-wagon, and another car, and they were all smoldering…one had hit the other, hit the other. There were two really burly guys: one in a blue shirt, one in a red shirt, and I think the guy in the red shirt had a silver handgun, you know. So, I just walked up and approached them and said, "Hey, guys," you know, "what happened?"

McGaw identified defendant as one of the men at the scene with a firearm standing near the rear of the Hummer. The defendant stated: "I got out of the car with my gun and he said [], 'You got a gun? I can go get mine.'" Defendant asked, "What was I supposed to do?"

McGaw testified that he realized someone had been shot so he "went up to the next vehicle, which was…like a silver Mercedes." He continued,

> the driver door was open and there was a large black man leaned into the vehicle like, you know, feet out of the car,

4

> leaned out across the driver's seat and the center console with his arm outstretched towards the glove compartment.

McGaw observed gunshot wounds to the victim's back, and checked for a pulse but felt only "a little flutter, if anything." The victim was "cold at the touch" and McGaw concluded that the victim was dead. The officer did not see a firearm in the victim's hand.

McGaw testified that he continued to hear screaming, so he "went around the nose of that car looking to see who else was hurt" and he observed a woman sitting on the curb, screaming and holding her calf. McGaw examined her injury, which he described as a "through and through" gunshot wound, which did not appear to be potentially fatal. McGaw testified that another bystander at the scene was recording video footage on a cell phone. He stated that he had viewed the footage and that it depicted the events to which he had testified. McGaw also identified defendant in the footage. The state introduced the cell phone video footage as exhibit five and played it for the jury.

Former NOPD Officer Amanda Williams testified that she was the first responding officer to the scene. She described "a small sedan" and two SUVs "stopped in the middle of the roadway" on a one-way street, "and one person shot in the middle SUV." Williams testified that the deceased victim in the Mercedes was lying on his stomach across the driver's seat with his legs and feet hanging outside of the vehicle, and it appeared that he had been "shot several times in the back." Williams did not observe a firearm in the victim's hand, nor did she observe a firearm on either the seat or floorboard of the vehicle, nor on the street "that could have been dropped by [the victim]." Williams testified that she had

recorded footage of her response to the incident on her police-issued, body-worn camera, which the state introduced as exhibit six and played for the jury.

Williams testified that her body camera footage depicted a witness at the scene who described "loud yelling and then shots firing," and who recalled that defendant was "walking closer to [the victim] as he was shooting him." Williams testified that defendant did not claim that the victim pushed or struck him, nor did he explain "why he brought his gun out at a car accident" or "why he shot [the victim] so many times," nor had he claimed that he tried to call 911 at any time that night. Williams testified that she recovered a firearm that was resting on the hood of defendant's vehicle at the scene. She also seized the adjacent, ten-round magazine which had been removed from the firearm, and which contained only one live round.

Williams testified that she observed damage to the glass in the rear of the victim's vehicle as well as broken glass on the ground nearby. Williams also recalled speaking to an Uber driver at the scene who "described seeing a white, possibly Hispanic, male with his shirt off, but he said he did not see that individual at any point in time with a gun."

On cross-examination, Williams agreed that the Uber driver also told her he had observed the (possibly) Hispanic male raising his arm as if he were holding a firearm. She also recalled testifying in 2016 at an associated proceeding that she had observed minor damage to the rear of end of defendant's vehicle.

On redirect examination, Williams confirmed that the Uber driver told her that he did not see anyone holding a firearm.

Jennifer Glass testified that in April of 2016, she resided near the intersections of Sophie B. Wright, and Felicity and Camp Streets with her infant

daughter. She stated that on the evening of April 9, 2016, she had hired a babysitter and had gone out with friends. After returning home and escorting the babysitter to the front gate, she heard arguing nearby, followed by multiple gunshots, so she and the babysitter ran back inside and looked out of the window. From her partial view, she observed "a couple over here, a man and a woman. One seemed to be either—I don't know whether he was completely shirtless or whether it was just unbuttoned…and they appeared to be arguing." Glass testified, "it looked like something was in his hand but I could not decipher what that necessarily was." Once the police arrived, Glass exited her residence and could see from her elevated porch a three-car accident and "a man at the driver's seat slumped over the wheel of the driver's seat in his car."

On cross-examination, Glass testified that when she heard the gunshots, she did not know from which direction they were fired, and none of her residential windows provided a view of the crime scene. Glass agreed that she speculated during her 2016 police interview that the shirtless man may have been holding a gun, but recalled also telling police that she "wasn't sure that it was a gun, he just had something in his hand."

Racquel Smith, the victim's widow and mother of their three children, testified that she was with the victim the night he was shot, and recounted the events leading up to the incident. Smith testified that she and the victim had attended the French Quarter Festival earlier that day. The victim was licensed to carry a concealed firearm, and he brought his weapon with him for protection, as he usually did. However, upon approaching the festival entrance they noted a security checkpoint, so they decided to return to the victim's parked vehicle and leave his firearm behind. Smith explained that they stored the firearm in the glove

compartment when their children were present; otherwise, the victim may have kept his firearm elsewhere. Smith testified that on that day, she observed the victim open the driver's side door and quickly lean across the driver's seat, but she did not see where the victim placed the firearm inside the vehicle.

Smith testified that the victim consumed a daquiri during the two hours they attended the French Quarter Festival. Thereafter, they paid a brief visit to a nearby restaurant owned by a family friend. Afterward, they decided to walk to Ruth's Chris Steakhouse for dinner and invited Smith's friend, Rebecca Dooley, and her boyfriend, Richard Hernandez, to join them. After dinner, the two couples went to a sports bar called Barcadia; however, Smith testified that they did not stay long, because the victim received a call from his friend and former teammate, Pierre Thomas, inviting him to Sake Café. Smith testified that by the time they arrived at Sake Café, Pierre Thomas had already finished eating, so the group did not remain long there either.

Smith testified that after leaving Sake Café, she and her friends rode with the victim in his vehicle down Magazine Street, heading toward downtown. At some point just before the "Magazine split," Smith felt the vehicle stop short, but denied that the victim had hit the vehicle directly in front of them. Rather, she stated that she thought either the victim had "press[ed] on the brakes really hard," or the vehicle had activated its automatic braking system on its own. The victim continued driving until coming to a stop at a red traffic light, when they were rear-ended by defendant shortly thereafter. Smith testified, "it was a hard hit and all I heard was shattered glass so I didn't know what was happening, stating that she "thought we were under attack." She could hear yelling coming from outside the vehicle (through the broken rear windshield) and saw two men from the vehicle

"that actually rammed behind us," who she later learned were defendant and his friend, Kevin O'Neal. Smith testified that upon seeing defendant, she thought, "oh my goodness, he's the same size as [the victim] or bigger," and described O'Neal as "taller, leaner [and] meaner."

Smith testified that by the time she exited the vehicle, verbal arguments had ensued between defendant, the victim, Hernandez, and O'Neal; she denied the altercation became physical at any time. Smith also denied that either she, the victim, or Hernandez possessed a firearm. Smith acknowledged that Hernandez removed his shirt during the exchange, and recalled thinking, "What is he doing?" Smith testified that during the argument, she approached defendant and pleaded with him to calm down, explaining, "I was like, 'Sir, please, we're not like this.' I even told him who [the victim] was." Smith then looked into her husband's eyes and asked him to think about their children. She testified that once she said their children's names out loud, the victim calmed down and walked away with her "and it was over."

Smith testified that she and the victim turned their backs to defendant and began to walk back toward their vehicle. Smith continued, "All I heard was a pop-pop, and then I felt the burning sensation and then I felt—I knew I was shot…There was a pause and then it was a pop-pop-pop-pop-pop-pop." Smith then heard defendant shout, "You wanna show off for the f**king white boy? Look at you now; look at you now." Smith recalled receiving assistance from several bystanders at the scene, then recalled being transported to the hospital, stating, "[then] I was out." Smith testified that when she awoke in the hospital, she met the homicide detective and learned the victim had been killed. Smith explained that as a result of the gunshot wounds, which had broken both of her legs, a metal rod was

9

screwed into her right femur accompanied by severe permanent scarring; she suffered nerve damage to her left leg; and her legs were permanently uneven.

On cross-examination, Smith testified that she could not recall whether the victim drank more than one glass of wine with dinner at Ruth's Chris, nor could she recall whether anyone in her group consumed any alcoholic beverages at Barcadia. Smith testified that when they arrived at Sake Café, they joined Pierre Thomas and three others already at the table: Timmy Doe, Billy Ceravolo, and the restaurant owner. Smith acknowledged that Rebecca Dooley's brother, Jonathan Whipple, was depicted on the police body camera footage of the crime scene later that night, but she had never seen him before and did not know whether he had also joined the group at Sake Café. She also denied "keeping track" of any alcohol that anyone in the group may have been consumed once she arrived at the restaurant. Smith denied that the victim appeared intoxicated after leaving the Sake Café.

Smith testified that she was unsure whether she observed the orange-colored Hummer stopped at the traffic light in front of their vehicle before or after she felt the victim "press[] on the brakes really fast," as it happened in seconds. Smith disagreed that her trial testimony "downplayed the intensity of the argument" between defendant and the victim, stating that "That argument was just an argument," and "it was not necessary for this man to murder my husband…over his feelings being hurt."

Smith denied that the victim told defendant, "Oh you got a gun? I'm going to get mine too," but recalled hearing someone at the scene yelling about a gun around the time that defendant shot her. Smith also explained that after she convinced the victim to walk away from the altercation, they turned their backs to defendant and headed in the opposite direction, stating: "And the only way you can

10

go, because [defendant] was right here, is to turn around and walk that way," which happened to be back toward the front of their vehicle. However, Smith specified that they were not re-entering their vehicle because it was "wrecked," they were "just walking away from [defendant]." Smith admitted that she did not see who shot her.

On re-direct examination, Smith testified that she recalled telling police during her interview in the hospital that she heard a male voice shout "What did you do?" following the shooting, and at some point, she heard the other voice say, "He thinks he's big and bad," or "something of that nature."

Pierre Thomas testified that he used to play football with the victim for the New Orleans Saints and had gotten to know him "like a big brother." Thomas stated that on April 9, 2016, he had just flown into New Orleans and his friend, Timmy Doe, picked him up from the airport and took him to Sake Café to eat dinner, where they were joined by the restaurant owner. Later in the evening, his friend, "Officer Billy," joined them as well. Sometime thereafter, Billy was texting with the victim and learned he was attending the French Quarter Festival, so they invited the victim and his wife to join them at Sake Café. Thomas testified that as they were finishing dinner, the victim and his wife arrived at the restaurant with three other people that he did not know. The restaurant owner "brought some bottles of wine out" and they sat around the table "drinking wine, just having a nice little conversation." Thomas testified that the victim did not appear intoxicated when he arrived at the restaurant, nor when they departed, and stated that the victim was in a good mood, "laughing, joking, smiling, full of energy, full of love."

Thomas testified that everyone in the group decided to relocate "to another venue to continue our night," and they departed Sake Café in multiple vehicles. Thomas stated that Billy and the restaurant owner left while he was in the restroom, so he was unaware of their mode of transportation. Thomas stated that he had travelled in Doe's white Lexus; the victim, his wife, and the couple they arrived with, departed in the victim's Mercedes G-Wagon; and the other male that Thomas did not know left in a green Impala. Thomas testified that the victim and his wife were discussing who would drive, and he asked the victim if he "was okay to drive, and he looked at me and said, 'I'm fine.'" Thomas testified that he and Doe drove out of the parking lot first, followed by the Impala, heading down Magazine Street toward downtown. They turned left off of Magazine Street (where it becomes a one-way street) and stopped at a red light. Thomas testified that he "heard a loud banging noise" and saw smoke rising a short distance behind them, and realized that the victim had been in a car accident.

Thomas testified that they pulled over and he exited the vehicle. He heard "a lot of yelling," but could not "make out what's being said on either side." He walked down the sidewalk toward the collision, approaching on the passenger side of the vehicles, and observed smoke rising from the Hummer's hood, and the rear windshield of the victim's vehicle was "shattered, caved in." Thomas continued, "I see the passenger's—I believe his name was Kevin on the—in the passenger's side of the Hummer. The two gentlemen that was at the dinner—at the dinner table at Sake [Café], they were on the passenger's side [of the street]." Thomas explained that "these three gentlemen [were] yelling back and forth," and one of them had taken off his shirt and appeared "ready to fight." On the opposite side of the street, Thomas observed defendant engaged in a separate argument with the victim.

Thomas denied seeing anyone engaged in a physical altercation and denied observing "a drink thrown in anyone's face;" he also denied seeing anyone in possession of a firearm at that time.

Thomas testified that he observed the victim's wife standing in front of him (with her back to defendant) "trying to get his attention, shaking him, pushing him, hitting him on his chest, trying to get him to calm down," and yelling to him, "It's not worth it; we have kids." Thomas testified that he saw the victim's demeanor change, and he could "see it in his eyes" and in his face that his wife "finally got his attention," and "he turned around and walked calmly back towards the—I guess, the front or the driver's side of his vehicle." Thomas admitted that at that point, he could no longer see the victim and his wife as the victim's vehicle was blocking his line of sight from his location; however, he denied that "anyone pose[d] a threat to [defendant] at that point," and denied hearing anyone say, "I'm going to get a gun." Thomas testified that once the victim walked away, "that's when my eyes noticed that the fight in front of me was about to break." He stated that one man "took his shirt off and he got into a fighting stance, and that's when I started to walk down [] to the curb in the street to de-escalate the situation [and] that's when I heard gunshots."

Thomas testified that he saw defendant firing the gunshots and described what he observed:

> [Defendant] was standing on the side of the driver's side equal with the hood of his vehicle, armed—and I don't know which arm was extended—with the gun, shooting; several shots. And then he started to move forward where he's now in the front of the vehicle of his Hummer, moving forward towards [the victim and his wife] and shooting more.

13

He continued, "I'm in disbelief at this point but I walked along the grass to the passenger's side of [the victim's] Mercedes, and I can see right through the passenger's side window [the victim] slumped over of (sic) the steering wheel." Thomas saw Doe fleeing the scene as he shouted to Thomas, "We gotta go… he just shot and killed [the victim]…he has a gun!" Thomas convinced Doe to return to the scene, and as he walked back toward the driver's side of the victim's vehicle, he heard defendant yelling, "Y'all saw what happened; y'all saw what happened; everybody seen what happened." Thomas testified that he heard Mrs. Smith screaming and he found her lying on the curb, bleeding, and holding her leg, asking for someone to check on the victim. Thomas testified that he briefly left the scene to be sick, and by the time he returned the police had arrived.

On cross-examination, Thomas testified that he did not recall whether anybody he was with at Sake Café consumed any shots of liquor, nor could he recall precisely how many glasses of wine he or anyone else at the table had consumed while they were there. After refreshing his recollection, Thomas agreed that during defendant's 2016 trial, he had testified that prior to the shooting, he had observed "the guy with his shirt off swing on the cat on the passenger's side of the vehicle." He also agreed that he told the police in 2016 that he heard both defendant and O'Neal say, "Call the police, call the police," after defendant shot the victim and his wife.

On re-direct examination, Thomas testified that the shirtless man did not interact with or threaten defendant at any time, and was engaged in an entirely separate altercation with O'Neal on the opposite side of the street from defendant's argument with the victim.

Prior to calling its next witness, the state introduced and played for the jury two electronic exhibits, numbers seventeen and eighteen, described as "a compilation of surveillance video collected from businesses along Magazine Street that kind of captures the Mercedes and the Hummer as they drive down towards their ultimate final crash" and surveillance footage taken from the Half Moon Bar & Grill around the time of the collision, respectively. Through a series of accepted stipulations, the parties agreed that at no time were the airbags in the victim's Mercedes deployed.

Christopher Dreiling testified that on April 9, 2016, around 11:00 pm, he was driving down Magazine Street and that he had pulled over because he heard gunshots close by, and he had exited his vehicle "to see what was going on." Dreiling testified that as he approached the scene, he heard arguing and observed a car accident with smoke coming from one of the vehicles. He observed "a person leaned over in the vehicle that was in front of the red vehicle, the black vehicle, and it didn't look like he was moving." Dreiling decided to record the scene on his cell phone in case the footage could be of assistance. He recalled that "there was another gentle man [sic] that joined me from the other side [of the victim's vehicle] and he checked his pulse and said that there was not much of a pulse." Dreiling did not see the victim in possession of a weapon. As Dreiling continued to film the crime scene, he observed defendant place a firearm on the hood of his vehicle and Dreiling thought he may have been the shooter, so he decided "to get out of there."

On cross-examination, Dreiling recalled that defendant had attempted to explain the events that led to the shooting, but O'Neal "cut[] him off and sa[id], 'Let me explain…'" Dreiling also testified that in the surveillance footage of the vehicles driving down Magazine Street, he observed "at least one of the occupants"

of the victim's vehicle "lurch forward at some point" when it either stopped short, or rear ended, defendant's vehicle.

Doctor Samantha Huber, Chief Forensic Pathologist for the Orleans Parish Coroner's Office, was qualified by the district court as an expert in the field of forensic pathology and testified that she conducted the victim's autopsy on April 11, 2016. She testified that the victim had suffered a total of eight gunshot wounds, only one of which had an accompanying exit wound. Seven bullets entered the victim's back and one entered the "left lateral side" under his arm. His injuries included fractured ribs, vertebrae, and other bones; one bullet lacerated his spinal cord and bullets also perforated his lungs, spleen, stomach, carotid artery, aorta, and heart. Dr. Huber testified that she placed a rod into the soft tissue of each bullet wound to determine the trajectory of the bullets when they entered the victim's body and found that all of the bullets that entered the victim's back "go upward from the back—they go up and forward, and from left to right," while the lateral wound had a slightly downward trajectory. Dr. Huber also testified that none of the wounds were surrounded by visible soot or stippling, meaning they were not sustained at a close range. Dr. Huber agreed that the trajectory of the bullet wounds suggested that the lateral shot entered the victim while he was standing upright, and the remaining seven bullets entered the victim's back while he was leaned forward, assuming the shooter was standing upright while shooting.

Dr. Huber testified that the victim's hands showed no signs of either offensive or defensive wounds, and he had no injuries to his face. She also conducted toxicology tests which revealed that the victim's blood-alcohol content was .235 percent, which indicated his intoxication level was "three times the legal limit to drive," but no narcotics were detected.

On cross-examination, Dr. Huber agreed that someone with a blood-alcohol level of .235 percent would be "actively intoxicated" with potentially impaired judgment. Dr. Huber testified that she had no way to determine in what order the victim sustained each gunshot wound. Dr. Huber testified that she recovered all of the projectiles that remained inside the victim's body and they all had a similar appearance.

Retired NOPD Homicide Detective Tindell Murdock testified that defendant's vehicle was seized and transported to NOPD headquarters pursuant to a search warrant. The state introduced the photographs taken during the search of defendant's vehicle as exhibit twenty-four *in globo*, which Det. Murdock described as each was published to the jury. Det. Murdock noted that one of the photos depicted a loaded, .357 Magnum, five-shot revolver "in the front passenger door pocket," which he explained could fire thirty-eight caliber ammunition. He also noted damage to the front bumper, the hood, and the front quarter panel of the vehicle, as well as "some damage to that spare tire cover that would have been on the back of the Hummer," although he stated that he could not determine when that damage was sustained.

Det. Murdock testified that the victim's vehicle was also searched at NOPD headquarters and he described the photographs that were taken during the processing of the vehicle. Det. Murdock noted the damage sustained to the rear end of the Mercedes, as well as damage to both the interior and exterior of the front passenger door that was struck by a bullet, which he explained was extracted from the door panel during the search. Det. Murdock described photos depicting the interior of the victim's vehicle showing that the glove box was open; French Quarter Fest daquiri cups located on the rear floorboard; and the victim's "gun that

17

is kind of wedged in between the center console and the driver's seat," in a holster, with a fully loaded "8-shot capacity magazine." He specified that the victim's firearm was a nine-millimeter, semi-automatic weapon, and incompatible with forty-five caliber ammunition.

The state introduced photographs taken at the scene of the shooting, and Det. Murdock described them as they were published to the jury. He noted that gunshot residue tests had been administered to both defendant and O'Neal at the scene, with defendant's yielding a "presumptive positive" result. Det. Murdock described photos depicting eight shell casings located on the ground, and one shell casing located on the front seat inside the victim's vehicle, as well as a projectile (bullet) that was also recovered from the scene, all of which were "sent off to the lab for testing."

On cross-examination, Det. Murdock testified that the revolver recovered from the well of the passenger door in defendant's vehicle belonged to O'Neal and had not been fired. He explained that when a revolver is fired, the casing of the bullet remains in the cylinder of the firearm rather than being ejected from the firearm as they are in semi-automatic weapons, and O'Neal's revolver contained five live rounds and no empty casings. Det. Murdock also explained that shell casings ejected from a semi-automatic firearm may bounce or move, depending on the type of surface they hit when they fall (i.e., pavement versus grass), but the pattern of shell casing locations may still represent the vicinity of where the weapon was located when it was fired.

Det. Murdock testified that after defendant was detained, he assisted Detective Brueggeman in taking defendant's statement, and that defendant was

arrested shortly thereafter. He also assisted in taking the statements of O'Neal and Dooley.

Meredith Acosta, qualified by the district court as an expert in the field of ballistics and firearms examination, testified that she examined the cartridge casings, projectiles and bullet fragments, which were recovered from the scene of the shooting, the victim's vehicle, and from the victim's body during the autopsy. She also examined the three firearms that were seized during the investigation: defendant's Ruger .45-caliber semi-automatic pistol, O'Neal's Taurus .357-Magnum Revolver, and the victim's Springfield nine-millimeter pistol. Acosta testified that all of the spent cartridge casings recovered at the scene were .45-caliber, and she determined that all of them had been fired from the same .45-caliber Ruger pistol, as were all of the projectiles and brass jackets recovered from both the scene and the victim's body.

Acosta testified that when a gun is fired, the combustion propels small amounts of the burnt gun powder, or gunshot residue, from the side and/or barrel of the gun, with a range of three to five feet, depending on weather conditions, or the positions of the shooter and the victim, for example. Accordingly, gunshot residue may be transferred to anyone who has fired or handled a firearm, or who has been shot at close range. She also stated that the shell casings ejected from defendant's firearm (and from most semi-automatic pistols in general), travelled "up and to the right," explaining that for a casing ejected from defendant's firearm to have landed on the front seat inside the victim's vehicle, defendant would have had to have fired his weapon in "close proximity" to that location. Acosta additionally explained that the trigger on a semi-automatic firearm must be pulled

each time a bullet is fired; thus, it would not have been possible for defendant to have fired multiple shots by pulling the trigger only once.

On cross-examination, Acosta speculated that the victim could have transferred gunshot residue onto his hands when he handled his firearm before entering the French Quarter Festival, or when he returned it to his vehicle, depending on how recently it had been fired and/or cleaned. Acosta testified that the projectiles removed from the victim's body during the autopsy were fired from "hollow point" ammunition, and all of them had expanded into a "mushroom-type" shape. She also identified one projectile recovered from the scene that had not expanded into the mushroom shape.

On re-direct examination, Acosta testified that projectiles fired from hollow point ammunition do not always expand, stating, "even though there's a hollow point, for example, just because it didn't mushroom does not mean that it didn't hit something. It just didn't act as though—as it was designed to do." She also agreed that bullets may pass through certain parts of the body and remain undamaged.

The defense called Abigaelle Levray, who testified that she lived "about half-a-block away from the Half Moon," where she had met a co-worker, Justin Ross, for dinner on April 9, 2016. They were sitting on the patio and heard "screeching brakes" and then "heard a car hit another car." She continued, "[T]here were four men that we heard arguing and screaming outside of the car very shortly after the impact." Levray recalled that defendant and O'Neal both had dreadlocks and were both wearing "dashikis," and described Hernandez as "a shorter guy that was—looked like of Latino origin with a lot of tattoos." She also recalled that the victim and Hernandez were "shouting louder and sort of egging on [defendant and

O'Neal]. They were saying, like, 'Come at me,' like, 'come for me,'" naming Hernandez as "by far the most aggravated one out of the four."

Levray testified that she observed two women trying to calm down the victim and Hernandez, although she stated that she "never saw any—any of the parties calm down." At some point, she heard defendant and O'Neal "telling the guys to calm down, and if they weren't gonna calm down that something would happen." Levray paraphrased her recollection of defendant's comments to the victim, "If you go back to your car, or if you get your weapon [] something is gonna happen so don't do it;" Defendant and O'Neal were "pretty much letting them know, 'If you go back there, [] I'm gonna use force that I don't wanna use." Levray stated that she then heard gunshots and took cover behind a nearby vehicle; she did not see who had fired the shots or in which direction. When she emerged, she and Justin Ross approached the scene, and defendant said to them, "We told him not to go for it."

On cross-examination, after refreshing her recollection, Levray recalled hearing either defendant or O'Neal claim to be "ex-military" and demand that the victim and Hernandez "back down or stand down because they were gonna do something dangerous if they didn't calm down." She also admitted that she never saw a firearm in the victim's possession, nor anywhere in his vicinity, nor did she ever hear anyone threaten to "go get a gun;" She also did not see Hernandez in possession of a firearm.

**DISCUSSION**

Our review of the record does not reveal any errors patent.

In his first assignment of error, defendant asserts that the state failed to present sufficient evidence to sustain the conviction for manslaughter, as it failed to prove that the shooting was not justified. Regarding this assignment of error the law is consistent and well established:

The Supreme Court provided the standard of review for a claim of insufficiency of the evidence as follows:

> ...[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Once a defendant has been found guilty of the crime charged, the factfinder's role as weigher of the evidence is preserved through a legal conclusion that upon judicial review *all of the evidence* is to be considered in the light most favorable to the prosecution.

(internal citations omitted).

> "Under the *Jackson* standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court." *State v. Williams*, 11-0414, p. 18 (La. App. 4 Cir. 2/29/12), 85 So.3d 759, 771.

> "Conflicting statements as to factual matters is a question that goes to the weight of the evidence, not sufficiency." *State v. Jones*, 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989). Such decisions rest solely with the jurors who, as triers of fact, may accept or reject, in whole or in part, the testimony of any witness. *Id.* A juror's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. *Id.*; *State v. Vessell*, 450 So.2d 938, 943 (La. 1984).

In *State v. Wells*, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306, we stated: "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion. *State v. Legrand*, 02-1462, p. 5 (La. 12/3/03), 864 So.2d 89, 94. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." *State v. Smith*, 600 So.2d 1319, 1324 (La. 1992). "[T]he *Jackson* standard does not provide a reviewing court with a vehicle for substituting its appreciation of what the evidence has or has not proved for that of the fact finder." *State v. Mack*, 13-1311, pp. 9-10 (La. 5/7/14), 144 So.3d 983, 989. A reviewing court may impinge on the "fact finder's discretion . . . only to the extent necessary to guarantee the fundamental due process of law." *State v. Mussall,* 523 So.2d 1305, 1310 (La. 1988).

*Hayes*, 2017-0789, pp. 17-18, 315 So.3d at 237-238.

La. R.S. 14:31 defines manslaughter in pertinent part as:

(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.

Here, defendant does not deny he pointed his gun at the victim and fired the bullets that killed him; he argues instead that the homicide was committed in self-defense, therefore justified, and the state failed to prove otherwise.

"When a defendant asserts that he acted in self-defense in a homicide case, it is settled law that the state bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. *State v. De Gruy*, 2016-0891,

23

p. 18 (La. App. 4 Cir. 4/5/17), 215 So.3d 723, 733, (citing *State v. Jefferson*, 04-1960, p. 10 (La. App. 4 Cir. 12/21/05), 922 So.2d 577, 587–88).

Under La. R.S. 14:18, "The fact that an offender's conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct [under certain circumstances]." A homicide is justifiable "when committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1).

However, the defense of justification is unavailable to an offender "who is the aggressor or who brings on a difficulty . . . unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict." La. R.S. 14:21; *State v. Abbott*, 2017-0016, p. 17 (La. App. 4 Cir. 6/14/17), 222 So.3d 847, 857.

In his brief, defendant suggests that the victim and Hernandez were the aggressors, citing to Levray's testimony that they seemed more aggressive than he and O'Neal. While trial testimony indicated that Hernandez took off his shirt and prepared for a physical altercation, there was no testimony presented that the victim physically attacked defendant at any time. Moreover, the victim and Hernandez exited their vehicle only after defendant rammed his vehicle into the back end of the victim's vehicle with enough force to shatter the rear windshield. As a portion of defendant's theory of the case was that the victim had rear-ended him first and failed to pull over, which Mrs. Smith disputed at trial, a rational juror could have found that defendant rear-ended the victim deliberately, thereby bringing the difficulty on himself and making him the aggressor in the situation. Additionally, a rational juror could have found that defendant's act of brandishing

24

a firearm was an unreasonable response to a verbal argument following a car accident, also making him the aggressor. In these circumstances, defendant would not have the justification of self-defense available as a defense to manslaughter.

Assuming that defendant was not the aggressor and did not "bring on [his own] difficulty," defendant asserts that the state failed to prove that he did not shoot the victim in self-defense. While defendant did not testify at trial, he appeared to rely on the statements he claimed to have made immediately following the shooting, alleging that the victim was going to retrieve his firearm from his vehicle, and that the shooting was necessary to prevent him from doing so.

There was no evidence was presented at trial supporting the claim that the victim threatened to arm himself or to shoot defendant. Although Mrs. Smith testified that defendant generally stored his handgun in the glove compartment, and the crime scene photographs depicted the victim's right arm outstretched toward an open glove compartment, trial testimony indicated that the victim's gun was actually discovered tucked between the driver's seat and the console and secured in a holster, which is consistent with its location depicted in the crime scene photos.

Dr. Huber testified that one bullet entered the victim's left side in a lateral trajectory, indicating he was standing upright when he was shot, while the remaining bullets entered the victim's back at a steep upward angle, consistent with the victim's photographed position "leaned over" the driver's seat. Thus, it appears that victim was shot first in his left side while standing upright, facing the sidewalk with his back to his vehicle. Whether the victim fell into his vehicle after he was shot, or he took cover in his vehicle after his wife was shot, or was reaching for his weapon in the wrong location when defendant fired seven more shots into his back, both the crime scene photos and eyewitness testimony indicate that the

25

victim was not in possession of a weapon when he was killed, and the only ballistics evidence recovered from the scene came from defendant's gun.

Because the state presented evidence that the victim had retreated from the altercation with his wife, and the physical evidence shows that the victim was shot once in his side while standing, then seven times in the back from an angle consistent with the victim's photographed position lying over his driver's seat, viewed in a light most favorable to the prosecution, a rational juror could have found that defendant's claim that he was in imminent danger of being killed was unreasonable, and that killing the victim was not necessary to prevent whatever harm defendant believed that he faced. Accordingly, the verdict of manslaughter should be affirmed.

In the defendant's second assignment of error, he asserts that the district court erred in granting the state's motion *in limine* to exclude evidence of the victim's character, specifically, his "propensity for violence while drinking."

Generally, a person's character traits or moral qualities are inadmissible in a criminal proceeding to prove that he acted in conformity therewith on a particular occasion. La. C.E. art. 404(A). However, an exception to the general rule is that

> [E]vidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible.

La. C.E. art 404(A)(2).

However, "evidence of other crimes, wrongs, or acts, is not admissible to prove the character of a person in order to show that he acted in conformity

therewith." La. C.E. art. 404(B)(1). The scope and purpose for which specific acts may be admitted are provided by La. C.E. art. 404(B)(2):

> In the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of the victim's prior threats against the accused or the accused's state of mind as to the victim's dangerous character is not admissible; provided that when the accused pleads self-defense and there is a history of assaultive behavior between the victim and the accused and the accused lived in a familial or intimate relationship . . . it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of the victim, including specific instances of conduct and domestic violence; and further provided that an expert's opinion as to the effects of the prior assaultive acts on the accused's state of mind is admissible.

In sum, to prove a victim acted in in conformity with his character on a specific occasion, only general reputation evidence of the victim's character (or moral quality) may be admitted, while specific instances of conduct are inadmissible. However, specific acts may be relevant and admissible if they are "prior threats against the accused," or show "the accused's state of mind as to the victim's dangerous character." *Id.* To prove a defendant's state of mind, that he believed he was in "reasonable apprehension of danger, it must be shown that the defendant knew of the victim's prior threats or reputation." *State v. Thomas*, 2011-1219, p. 15 (La. App. 4 Cir. 12/6/12), 106 So.3d 665, 676 (citations omitted); "Once this knowledge is established, evidence of the victim's character, both general reputation and specific threats or acts of violence against the defendant are admissible." *Id.*, p. 15, 106 So.3d at 675; *See also State v. Montz*, 632 So.2d 822, 825 (La. App. 4 Cir. 1994). However, "acts committed by the victim against third

27

parties is not admissible." *State v. Wells*, 2011-0744, p. 20 (La. App. 4 Cir. 4/13/16), 191 So.3d 1127, 1143 (quoting *Montz,* 632 So.2d at 825).

Here there was no evidence presented at trial to indicate that defendant knew the victim's identity, or was aware of his reputation, or that defendant knew the victim was intoxicated when defendant exited his vehicle with a firearm after crashing into the victim's vehicle. Therefore, evidence of the victim's reputation or character would not be admissible. Accordingly, this assignment of error has no merit.

In the defendant's third assignment of error, he asserts that the district court erred in sustaining the state's objection when he attempted to refresh Pierre Thomas's recollection regarding the number of tequila shots everyone at the table drank at Sake Café using a receipt from the Sake Café.

Any error in preventing defense counsel from attempting to refresh Thomas's memory as to whether nine shots of tequila had been ordered at Sake Café is harmless. Evidence that nine shots of tequila were ordered is not evidence that they were consumed, or of who may have consumed them. No evidence was presented at trial showing defendant was aware that the victim had been drinking or that he was intoxicated. Moreover, that the victim was intoxicated when the shooting occurred was not disputed; the jury heard Dr. Huber testify that the victim's blood-alcohol level was .235 percent, which she explained would have rendered him "actively intoxicated" with "impaired judgment." Accordingly, the jury would have known he had been drinking and any evidence that he consumed a shot (or more) of tequila at Sake Café would have been cumulative and the jury's verdict was surely unattributable to any error on the part of the district court. *See State v. Young*, 2020-01041, pp. 7-8 (La. 5/13/21), 320 So.3d 356, 361; *State v.*

*Miller*, 2014-0406, p. 39 (La. App. 4 Cir. 2/25/15), 160 So.3d 1069, 1092. *See also* La. C.Cr.P. art. 921 ("A judgment or ruling shall not be reversed by an appellate court because of any error, defect, irregularity, or variance which does not affect substantial rights of the accused."). This assignment of error is without merit.

In his fourth assignment of error, defendant asserts that the district court erred in failing to grant his motion for a mistrial after juror four told other jurors that she felt uncomfortable serving due to her notoriety in the community, and because she had a "visible reaction" when she saw local celebrity Big Freedia enter the courtroom one day and told other jurors that they were acquainted. Defendant asserts that juror four also "expressed fear that after the trial she could be harassed in public," although he acknowledges that she denied communicating this to any other jurors. Nevertheless, defendant complains that the district should have individually questioned the other jurors to "determin[e] the extent of the taint."

In his reply brief, defendant mischaracterizes the context of juror four's colloquy with the district court to suggest that her use of the word "uncomfortable" with the other jurors referred to her fear of dangerous public backlash. The transcript reveals that after juror four specified her concerns regarding what she observed on social media to the district court in chambers, the following exchange took place:

   **COURT:** Did you discuss anything with your fellow jurors about this?

**JUROR 4:** No.
\*\*\*
**STATE:** When somebody pointed—and thank you for bringing this to our attention. When someone pointed out that Freedia was in the audience, did you have any reaction whatsoever?

**JUROR 4:** Yeah. I was like, "Oh my God, I know her." I said, "I share a makeup artist with her. She knows me."

**STATE:** Did you tell your fellow jurors that you felt uncomfortable?

**JUROR 4:** Yes.

**COURT:** But did you couch it in terms of, like, "I've been threatened, I feel uncomfortable," or just—

**JUROR 4:** No, no. Just like, I'm, I'm—people know who I am. This is maybe not the place for me.

**COURT:** So, you were talking about it in terms of yourself feeling like, "I'm very visible right now."

**JUROR 4:** Yeah. Because remember during voir dire, I asked the question about do media get ahold of our names because I was like, "I don't—I don't need anything," you know, I'm a public person.

**DEFENSE:** Did you express concern for your safety like you have back here?

**JUROR 4:** No. I didn't feel anything until I saw that post [on social media] today where I saw the anger around the case.

**DEFENSE:** But you didn't share that with them?

**JUROR 4:** No. Uh-uh (Negative response).

Defendant presented no evidence that juror four expressed fear or concern for her safety to the other jurors. Defendant also failed to demonstrate how juror four's comments to other jurors regarding her relationship with Big Freedia would either taint or "sway the jury." The defendant has failed to demonstrate that the district court erred in not granting his motion for a mistrial based on juror four's alleged communication with other jurors. This claim is without merit.

In his fifth assignment of error, defendant asserts that the district court erred in applying the firearm sentencing enhancement notwithstanding the state's failure to comply with the statutory requirements.

La. C.Cr.P. art. 893.3 authorizes enhanced sentences for felonies and specifically enumerated misdemeanors when the finder of fact finds beyond a

reasonable doubt that an offender possessed a firearm (Paragraph A), used a firearm (Paragraph B), discharged a firearm (Paragraph C), or used or discharged a firearm causing bodily injury (Paragraph D) during the commission of the crime. Additionally, 893.3(E) provides:

(1)(a) Notwithstanding any other provision of law to the contrary, if the finder of fact has determined that the defendant committed a felony with a firearm as provided for in this Article, and the crime is considered a violent felony as defined in this Paragraph, the court shall impose a minimum term of imprisonment of not less than ten years nor more than the maximum term of imprisonment provided for the underlying offense. In addition, if the firearm is discharged during the commission of such a violent felony, the court shall impose a minimum term of imprisonment of not less than twenty years nor more than the maximum term of imprisonment provided for the underlying offense.

(b) A "violent felony" for the purposes of this Paragraph is: second degree sexual battery, aggravated burglary, carjacking, armed robbery, second degree kidnapping, manslaughter, or forcible or second degree rape.

(2) A sentence imposed under this Paragraph shall be without benefit of parole, probation or suspension of sentence.

To trigger the penalties set forth in Article 893.3, the state must comply with La. C.Cr.P. art. 893.1, which requires it to file a "motion within a reasonable period of time prior to commencement of the trial of the felony or specifically enumerated misdemeanor in which the firearm was used." The motion must contain "a plain concise, and definite written statement of the essential facts constituting the basis for the motion" and "specify the provisions of this Chapter under which the district attorney intends to proceed."

Defendant asserts that the state provided only oral notice of its intent to seek the firearm sentencing enhancement, and only did so after closing argument during

31

the discussion of the jury instructions. Defendant acknowledges that the state filed a written motion to invoke the firearm sentencing enhancement before defendant's first trial in 2016, but argues that the reversal of his convictions in 2021 "wipe[d] the slate clean . . . as if [he] had never been tried." Defendant contends that all of the rulings on previously litigated pre-trial motions were "nullified," citing to a footnote in *State v. Aldridge*, 2022-0245, p. 8 (La. App. 4 Cir. 5/18/22), 340 So.3d 1188, 1194, which provided that "courts are not limited to prior rulings but rather may reconsider even identical issues previously considered."

In its appellee brief, the state points out the permissive rather than the mandatory language provided in *Aldridge*, and noted that it was not required to re-litigate any suppression motions prior to defendant's second trial. While the parties may choose to relitigate an issue at a subsequent trial, it is not a requirement. The state also notes that it placed defendant on notice during pre-trial negotiations that it intended to invoke the firearm sentencing enhancement again and that the written motion "was still viable." Discussions that occurred during trial and the sentencing hearing corroborate the state's contention that defendant was aware of the state's intent to rely on the 2016 motion to invoke the firearm sentencing enhancement.

During discussions regarding jury instructions, the state asked the district court to include a verdict form containing the firearm sentencing enhancement, and stated:

> I don't think there's any secret that we intended to do it at this trial and make it still apply. We were in court the last time when we put—you know, the change in the law inured to the benefit of the defendant, because the way they worded the law, it's something that the jury has to find so it suggests that you cannot do it on a plea. And so that was—we spent a lot of time on that in open court just a couple of months ago.

In denying defendant's motion to quash the sentencing enhancement, the court stated:

> Again, the motion was filed properly by the state on November 29, 2016, was invoked after the last trial, and more recently, as we prepared for this trial, in pretrial negotiations, in plea negotiations, the state, this year, or 2023 did inform the court and the defense that this 893.3 invocation of firearm sentencing enhancement was on the table and was going to be pursued by the state.
> The court feels that this is distinguishable from what your talking about, Ms. Chervinsky, relative to clean slate and new trials being granted. This is something that you're on notice about. I agree with the state. Everyone knows that the firearm is part and parcel of the charge in this so there's no surprise to the defense in this matter. Motion to quash is denied.

While addressing this issue in its ruling denying defendant's motion for a new trial, the district court stated on the record that "[t]he defense knows and was told during this second trial, all previously filed motions were adopted in the second trial proceeding."

In *State v. Curtis*, 2004-111, p. 6 (La. App. 3 Cir. 8/4/04), 880 So.2d 112, 116, the defendant pled guilty to manslaughter and the state filed a written motion to invoke the firearm sentencing enhancement the morning of the sentencing hearing, and defendant objected to the notice as untimely. The trial court overruled the objection and noted that the language of the statute required reasonable notice prior to the commencement of trial, and the defendant had not stood trial, but entered into a plea bargain. *Id.*, 2004-111, p. 6, 880 So.2d at 116. Moreover, the defendant was indicted with second degree murder, which carried a potential sentence of life imprisonment without the benefit of parole, probation, or suspension of sentence, and thus, the state "had no reason to invoke the firearm enhancement provision before trial because it was inapplicable to that charge." *Id.*

The record in that case reflected that the state had pretrial discussions with the

defendant regarding its intent to invoke the firearm sentencing enhancement, and

accordingly, the appellate court found that the defendant had "actual notice of the

state's intent to invoke the firearm enhancement provision," and reasoned:

> Written notice under [La. C.Cr.P.] art. 893.1 serves as proof that the State has timely notified a defendant of its intent to invoke the article and ensures that the State informs a defendant of the essential facts that constitute the basis for the article's invocation. In the instant case, the State notified the Defendant at the earliest possible opportunity that it intended to invoke the enhancement provision and requested a hearing, both in open court, and with the Defendant's acknowledgment. Thus, the record provides proof that the State timely notified Defendant of its intent. Additionally, during Mr. Curtis' guilty plea, he admitted "that the fatal shot that killed Mr. Freeman came from the gun [he] had." Accordingly, Mr. Curtis had already admitted the "essential facts constituting the basis" for Article 893.3's application. Accordingly, the record provides proof that the purposes of Article 893.1's written notice requirement were met through actual notice to the Defendant at the earliest opportunity. Thus, given the particular facts and circumstances in this case, the Defendant did, in fact, receive timely notice.

*Id.*, 2004-111, p. 8, 880 So.2d at 118.

Similarly, in this case, the district court acknowledged that all of the parties

were aware that the state had provided notice that it intended to rely on its

previously-filed written motion to invoke the firearm sentencing enhancement.

Defendant argues that the state's 2016 written motion is insufficient because

it failed to set forth a plain concise, and definite written statement of the essential

facts constituting the basis for the motion, as it incorrectly asserted that defendant

was charged with second degree murder and attempted second degree murder.

However, the motion also stated that defendant shot the victim with a handgun, and

sought enhancement under provision Art. 893.3(E)(1) should a verdict of manslaughter be returned.

The Supreme Court held in *State v. Aaron*, 2011-0307, pp. 1-2 (La. 6/24/11), 66 So.3d 18, 18-19, that the provision in Art. 893.1 requiring a statement of facts constituting the basis for the motion and specifying the chapter under which the state intends to proceed "should not serve as technical traps for the state when it otherwise clearly signals its intent before trial to seek enhancement of defendant's sentence under the provisions of La. C.Cr.P. art. 893.3."

In this case, the state's 2016 motion set forth a statement of facts indicating that defendant discharged a firearm resulting in the death of the victim, and sought to proceed under the provisions of the statute, which include a specific penalty provision for a conviction of manslaughter. Accordingly, the district court did not err in finding that the state's 2016 written motion invoking the firearm sentencing enhancement was valid.

In his sixth assignment of error, defendant asserts that the district court erred in "creating a coercive atmosphere in which the jury clearly believed it could not leave the court until it reached a verdict," and ultimately deliberated from 7:30 pm until reaching its verdict just after midnight. A review of the trial transcript reveals that the jury returned at 9:25 pm and asked the district court to re-read the definitions of manslaughter and its responsive verdicts. Thereafter, juror three asked, "I was just wondering, do we have to make a deliberation…or there will be certain—or we're dismissed and we come back later?" The district court replied, "I'll cross that bridge when we get to it. We are going to keep working until you reach a verdict, hopefully tonight." The jury returned at 10:46 pm requesting further definitions, and returned with a verdict at 12:22 am.

Defendant failed to lodge a contemporaneous objection at any time during jury deliberations. The first time that defendant objected to the late hour of deliberations was in his motion for a new trial filed on April 18, 2024. "It is well-settled that an irregularity or error, relating to 'the ruling or order of the court,' cannot be availed of after verdict unless it was objected to at the time of occurrence." La. C.Cr.P. art. 841(A); *see also State v. Marlowe*, 10-1116, p. 35 (La. App. 4 Cir. 12/22/11), 81 So.3d 944, 966. "The contemporaneous objection rule has two purposes: (1) to put the trial judge on notice of the alleged irregularity so that he may cure the problem and (2) to prevent a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection." *State v. Thomas*, 427 So.2d 428, 433 (La. 1982). Accordingly, this claim was not preserved for review by this Court.

In his seventh assignment of error, defendant asserts that the state failed to turn over in discovery three recorded witness statements provided by Jennifer Glass on April 15, 2016, Racquel Smith on May 10, 2016, and Justin Ross on May 19, 2016. Defendant concedes that the state turned over either the transcripts or the written summaries of the witnesses' recorded statements, but argues that without the actual recording, "it is unknown how long these statements lasted and whether additional, exculpatory information was disclosed during these interviews that was not reduced to writing."

The state denied that the recorded statements were contained in the central evidence and property system, and indicated it had provided "open-file discovery" to defendant "back in 2021." The state continued:

> I can say that, when I arrived at the DA's office in 2021 . . . there was no data storage system . . . . Everything at their office floated around on flash drives or external

> hard drives, and if they were lost or taken or damaged, they were gone. And so, when we tried to find this file, this is something I had to personally rebuild from going to NOPD myself with a laptop, with a DVD burner and copy everything that would ultimately be turned over to the defense in open-file discovery. I don't know what was turned over by the previous prosecutors in the first trial…I personally went over there, looked for everything we possibly had. I copied everything. I wasn't looking for one specific thing. I copied everything we had, gave it to the defense.

Defendant filed a motion to quash the indictment on January 17, 2024, seeking in the alternative, to impeach witnesses using the written transcripts or summaries of the statements at trial. Although the district court denied defendant's motion to quash, it granted the alternative motion to allow defendant to admit the written summaries at trial.

The state has a duty to disclose evidence favorable to the accused which is material either to guilt or punishment, and includes that which impeaches the testimony of a witness when the reliability or credibility of that witness may determine guilt or innocence. *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97, (1963); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, (1985); *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 756, (1972).

However, the state's failure to preserve such evidence constitutes a due process violation only if the defendant can demonstrate that the evidence "possess[ed] an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by any other reasonably available means." *California v. Trombetta*, 467 U.S. 479, 489, 104 S.Ct. 2528, 2534, (1984). When the state has failed to preserve "potentially useful" evidence, or "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of

which might have exonerated the defendant," there is no denial of due process unless defendant can show the state destroyed the evidence in bad faith. *Arizona v. Youngblood*, 488 U.S. 51, 57-58, 109 S.Ct. 333, 337, (1988); *State v. Lindsey*, 543 So.2d 886, 891 (La. 1989).

The state asserts in its appellee brief that it had turned over to defendant all of the recorded statements before defendant's first trial, and points to the 2016 trial transcript, which reflects defense counsel's cross-examination of Ross with his recorded statement from May 19, 2016. A review of the 2016 trial transcript corroborates the state's claim. While cross-examining Ross at defendant's first trial, defense counsel confirmed that Ross provided a recorded statement to Det. Brueggeman in the backseat of his police vehicle, and asked Ross, "And you say, essentially, a similar story to what you say on [April] 9th, right?" to which Ross agreed. After discussing the substance of the interview, defense counsel asked, "And I think the words that you used in your interview—actually not 'I think,' I know because I wrote it down—was you told him not to—I mean, [defendant's] explaining or he's exclaiming, 'I told him not to do it,' right?" to which Ross again agreed. Defense counsel then stated, "And that's exactly what you tell Det. Brueggeman on May 19, of 2016?" and Ross agreed. Defense counsel also confirmed that Ross stated in that interview that he heard one of the Hummer's occupants scream for a bystander to call 911, and that Ross's May 19, 2016 interview "lasts a grand total of nine minutes and thirty-four seconds." Defense counsel also confirmed that the FBI interviewed Ross nearly five months later, and asked Ross, "You told them essentially what you told Det. Brueggeman and Det. Ripp in the back of the police car on May 19th, right?"

From defense counsel's cross-examination of Ross during defendant's 2016 trial, it appears that defendant was in possession of Ross's recorded statement provided to police on May 19, 2016, and that he "essentially" provided the same description of events as in the statement he gave on April 9, 2016, and was apparently cross-examined thoroughly thereon. Accordingly, although the state claimed it did not possess Ross's May 19, 2016 recorded statement at the January 17, 2024 hearing, the original appellate record corroborates the state's assertion that it had turned over the statement in 2016; that defendant was aware of the contents; and had cross-examined the witness thereon. It does not appear that the statement contained any exculpatory evidence of which defendant would have been unaware.

Defendant asserts that Racquel Smith's May 10, 2016 recorded statement also likely contained exculpatory material, although the basis for this claim is unclear. Defendant introduced the written summary of Smith's recorded statement as exhibit six, which provided:

> On Tuesday, 05-10-2016 at 9:45 A.M., Detective Brueggeman conducted an audio/video interview in room #1 with Raquel Smith. Ms. Smith's attorney, Peter Thomson was present during the interview. Mrs. Smith reiterated the fact that she was standing near the driver side of her Mercedes when the gunfire started. When asked where [the victim] kept his gun prior to the altercation, she was unable to confirm due to the fact that he was wearing it concealed when they went to the French Quarter Festival, but once they observed the "No Firearms" sign at the entrance gates, he walked back to their Mercedes and put the firearm away. Mrs. Smith stated that she did not know where [the victim] put it, but he usually stored his firearm in the glovebox. Mrs. Smith stated that there were no other firearms stored in their Mercedes, nor was she armed with a firearm. Mrs. Smith stated that both she and [the victim] have concealed carry firearm permits.

While the crime scene photographs of the victim's Mercedes reflect that the glove box was open, no evidence was presented as to when or how it opened. The victim's firearm was located in a holster between the driver's seat and the middle console. Dr. Huber and the coroner's report indicated that the victim was first shot in his side, under his left arm, while he was standing upright. Based on this evidence, it appears that the victim was not shot while he was reaching into his vehicle, but while he was standing outside.

The written summary of Smith's statement does not appear to possess any exculpatory value to defendant whatsoever; thus, it seems unlikely that her (missing) recorded statement would contain any exculpatory information. The exhibit itself appears to constitute "comparable evidence" that defendant was able to obtain by another reasonably available means. Defendant has neither shown nor asserted that the state acted in bad faith in failing to turn over the recorded statement, or that it deliberately destroyed the evidence.

Regarding the April 15, 2016 recorded statement of Jennifer Glass, defendant admitted at the January 17, 2024 hearing that he possessed a summary of her statement, in which she stated that after the shooting, "she saw Richard Hernandez standing outside, yelling, with his shirt off, and holding an object that she believed might have been a firearm." Defendant introduced the written summary of Glass's statement at trial as defense exhibit five, which provided pertinently,

> Jennifer Glass stated that she had been out that evening and had returned via Uber. She had a sitter (identified as Nicole Gibbon) watching her infant daughter. She walked her sitter to the front gate and heard voices. Glass and her sitter spoke about the voices. Glass was puzzled; she could not tell if they were the

sounds of revelry or of a conflict. She reported hearing about five shots.

Glass and Gibbon then retreated into 1562 Camp Street and looked out of her front window. She described seeing a shirtless male and a woman in a cocktail dress in the roadway of Sophie Wright near the side of 1202 Felicity Street. Glass thought the shirtless male had something in his hand. Her thought was that it may have been a gun, but she could not be sure. Glass also reported that the woman was trying to keep the male away from the vehicles in the roadway and the two appeared to be yelling.

At trial, Glass agreed on cross-examination that she told police in 2016 during her recorded statement that Hernandez was holding something that "may have been a gun," but that she "could not be sure." Glass also testified on direct examination that the reason she thought the object in Hernandez's hand may have been a gun was because she had just heard gunshots, but that he also could have been holding a beer bottle, or his shirt, or anything else.

Defendant asserts that the possibility that Glass thought Hernandez may have been holding a gun may have been "potentially" exculpatory if Glass could establish the presence of another firearm at the scene, which he was unable to establish. Defendant admitted during cross-examination that Glass had told police in 2016 that she could not be sure that the object Hernandez possessed was a firearm. Glass testified that she did not witness the shooting.

As with the written summary of Smith's statement, the written summary of Glass's statement also appears to constitute "comparable evidence." Further, even if the information contained in Glass's statement were "potentially" exculpatory, as defendant claimed, without evidence that the state acted in bad faith in failing to provide the recorded statement, defendant is not entitled to relief on this claim.

In his final assignment of error, defendant asserts that the district court erred

41

in imposing an unconstitutionally excessive sentence "because the court relied on the same considerations from 2016 to impose sentence and declared that nothing has changed." Notably, the district court imposed a shorter sentence following defendant's recent manslaughter conviction of twenty-two years and two months imprisonment at hard labor, with twenty years served without the benefit of parole, probation or suspension of sentence, than it did following his manslaughter conviction in 2016. Defendant asserts that the district court failed to consider his model behavior in the years between his initial conviction and his second trial, and that he had another child to care for while under home incarceration.

La. R.S. 14:31(B) provides, "Whoever commits manslaughter shall be imprisoned at hard labor for not more than forty years." In this case, the district court imposed a sentence of twenty-two years and two months, which is significantly less than the proscribed maximum punishment.

A sentence is unconstitutionally excessive if it makes no measurable contribution to acceptable goals of punishment, is nothing more than the purposeless imposition of pain and suffering, and is grossly out of proportion to the severity of the crime. *State v. Ambeau*, 2008-1191, p. 9 (La. App. 4 Cir. 2/11/09), 6 So. 3d 215, 221. "A trial court is afforded broad discretion in making sentencing decisions," *State v. Bradley*, 2018-0734, p. 8 (La. App. 4 Cir. 5/15/19), 272 So.3d 94, 99-100, and "a sentence shall not be set aside for excessiveness if the record supports the sentence imposed." La. C.Cr.P. art. 881.4(D). Thus, "[t]he relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate." *State v. Mathieu*, 2018-964, p. 4 (La. App. 3 Cir. 11/6/19), 283 So.3d 1041, 1045 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957).

On appellate review of an allegedly excessive sentence, the entire record may be considered, including "any evidence or relevant information introduced at preliminary hearings, hearings on motions, arraignments, or sentencing proceedings," or provided in a "presentence investigation report filed into the record at sentencing." La. C.Cr.P. art. 881.3.

In imposing its sentence, the district court provided the following reasoning:

> Ms. Chervinsky, much of what you say I cannot do anything except concede, all the things that you have placed on the record in terms of [defendant's] behavior while incarcerated and while out on home incarceration.
>
> This court has struggled with this case since the time I got it and have heard obviously two presentations to twenty-four different people that sat on these two different juries. And the court has struggled with what should be the right outcome in this case once the jury made its finding of manslaughter. This court, however, as it goes through the scenarios that have played out, presented by both the state and defense, comes back to the singular thing that I have to focus on as the sentencing judge. And there are certain indisputable facts and many inescapable conclusions that this court has come to, back during the first trial and certainly after the presentation of the second trial. And one is that the vehicle that you, [defendant] was driving rammed the decedent's vehicle in this case. That is an indisputable fact, that the car that you were driving slammed into the victim's car with such force that the back windshield was shattered. And in the video camera cell phone footage that this court observed during the second trial, certainly the extent of damage to [the victim's] car was clearly visible, as well as the damage to the car that you were driving that night, a larger and possibly heavier car.
>
> The second indisputable fact is that you were armed[] when you alighted from that vehicle. And in the second trial, it's quite clear that Mr. O'Neal also had a gun on him, as that cell phone camera footage showed Mr. O'Neal taking the gun from his jacket as the police started to come to the scene.
>
> The third indisputable fact is that [the victim] was not armed. The pictures in this case clearly show that [the victim] was retreating back to his vehicle, perhaps to arm himself, perhaps not. There was clearly a holstered gun in his car. And the coroner's testimony, at both the first trial

and the second trial, clearly showed to the finders of fact—that is the jury—the number of shots and where they were placed in [the victim], with [the victim] dying on his feet as he was reaching into his car to protect himself and his family.

The court sees no reason to change its sentence that it imposed in the initial trial. There have been no new facts that would alter this court's deliberation as to what the sentence should be. The court articulated 894.1 circumstances on the record at the first sentencing, both in terms of aggravating circumstances and mitigating circumstances. The court finds no need to go through those again as the court will obviously adopt again all articulated reasons for the sentencing that it's about to impose.

Again, number one, that there's an undue risk that, during the period of a suspended sentence or probation, the defendant would commit another crime; the defendant is needing correctional treatment or a custodial environment that can be provided most effectively by commitment to the institution, and that any lesser sentence would depreciate the seriousness of the defendant's crime.

Defendant asserts in his brief that the court erroneously declared that the three "facts" underlying its sentence were undisputed, arguing first that he did not "intentionally" ram his vehicle into the back of the victim's vehicle. However, the district court did not declare defendant intentionally rammed his vehicle into the victim's car, thus the court's description of the evidence was not inaccurate. Defendant also claims that the victim's windshield was completely intact as reflected in the crime scene photographs; however, numerous trial witnesses testified that the rear windshield had completely shattered, and Det. Murdock testified that the shattered glass in the rear windshield was being temporarily held together by the film used to tint the windshield.

Next, defendant, in his appellant brief, does not dispute that he was armed when he exited his vehicle, but instead justifies his choice to arm himself due to the loud screaming by the victim and Hernandez. Lastly, defendant disputes the

district court's conclusion that the victim was not armed by arguing that one or two witnesses testified to seeing something in Hernandez's hand, which may have been a gun. Defendant also asserts that the victim's glove box was open, and he normally stored his firearm in the glove box. However, none of these assertions contradict the district court's conclusion that the victim was not armed when defendant shot him eight times.

The state argued at the sentencing hearing that defendant had not actually been rehabilitated, nor had he taken responsibility for his actions, as he still maintained he was justified in shooting the victim in the back eight times based on the possibility that he might be going to arm himself.

Even if the district court had mischaracterized the evidence presented at trial, the sentence it imposed was not out of proportion to the severity of the crime. The record in this case provides adequate factual support for the sentence imposed, and defendant's sentence need not be set aside on this basis.

**CONCLUSION**

For the reasons set forth above, defendant's conviction and sentence are affirmed.

**AFFIRMED**