JUDGE SANDRA CABRINA JENKINS
|, Defendant, Gregory De Gruy, was charged by bill of information with one count of aggravated assault with a firearm, in violation of La. R.S. 14:37.4. Defendant entered a plea of not guilty and elected a trial by judge. Following a one-day bench trial, defendant was convicted of aggravated assault, a responsive verdict to the charged offense. After a hearing on defendant’s motion for post-verdict judgment of acquittal, which the trial court denied, defendant was sentenced to three months in Orleans Parish Prison, all of which was suspended, three months inactive probation, and ordered to pay a fine and court costs. Defendant now appeals his conviction. Upon review of the record in light of the applicable law, we find no merit in defendant’s assignments of error on appeal.[1] Accordingly, we affirm defendant’s conviction.
STATEMENT OF FACTS
The State charged defendant with aggravated assault with a firearm upon the victim, Emmanuel Henry, III, on June 5, 2015. At trial, the following testimony and evidence was presented.
|2The seventeen-year-old victim, Emmanuel Henry, III (“Emmanuel”), testified that on June 5, 2015, around 9:00 p.m., he was walking from a friend’s house to his home at 4726 Bundy Road. Emmanuel stated that he had been playing football that evening and was wearing a tight, white t-shirt and shorts. As he was walking on the sidewalk along Bundy Road, about a block from his house, Emmanuel saw defendant retrieving mail from a mailbox. As Emmanuel got closer, defendant was standing at the mailbox and holding a gun towards him; Emmanuel heard defendant say, “keep it moving, son. I’ll knock your head in the dirt.” Emmanuel immediately put both his hands in the air and told defendant: “I’m just trying to get home.” Emmanuel then heard his father yell at defendant from down the block, saying: “Hey, what are you doing?” Emmanuel kept walking towards his father as defendant got into a car in the driveway and sped off, driving the wrong way on a one-way street. Emmanuel’s father then called the police, who arrived and took a report.
When asked whether defendant had pointed the gun at him, Emmanuel stated, “yes,” and said the gun was facing his stomach; he then indicated in court how defendant had held the gun. Emmanuel testified that he did not know why defendant pointed the gun at him. He stated he was just walking home, and he did not make any aggressive or threatening gestures toward defendant. When he heard defendant say “I’ll knock your head in the dirt,” and he saw the gun pointed at him, Emmanuel believed that defendant would shoot him “if I was to try something or anything.” When asked how he felt during this incident with defendant, |,sEmmanuel testified: “I was scared. [... ] I felt like [defendant] was going to shoot me.”
Emmanuel Henry, Jr. (“Mr. Henry”) testified that he is Emmanuel’s father and he was at 4726 Bundy Road on June 5, *726 2015.[2] About 9:00 p.m. that night, Mr. Henry had just spoken to Emmanuel on the phone and was standing in the driveway waiting for him to return home. Mr. Henry saw Emmanuel walk around the corner onto Bundy Road about a block away from where Mr. Henry was standing. At the same time, Mr. Henry noticed defendant, who owned the house four houses down, getting mail from his mailbox with a gun underneath his arm. As Emmanuel walked by defendant, Mr. Henry saw Emmanuel pause and put his hands up in the air. Mr. Henry began to approach them and saw defendant holding the gun in his hand pointed towards Emmanuel. Upon seeing this, Mr. Henry yelled at defendant: “What are you doing? That’s my son.” Mr. Henry told Emmanuel to keep walking towards him and, once Emmanuel got past the defendant, defendant got into a gold BMW parked in the driveway and drove off in the wrong direction on the one-way street. Immediately after the incident, Mr. Henry retrieved his cell phone and called 911. Mr. Henry stated that after the incident his son was “shaken up” and “[n]er-vous bad.”
On cross-examination, Mr. Henry testified that he could not hear any words exchanged between Emmanuel and defendant, but he did not see Emmanuel make any aggressive gestures toward defendant at any time. Mr. Henry stated that he did | ¿see Emmanuel put his hands in the air and then lift up his shirt, as if to show defendant that he did not have any weapons. Mr. Henry could not estimate how long the interaction between his son and defendant lasted. He also acknowledged that another neighbor was outside and closer to defendant’s house when the incident occurred.
Shatasha Johnson, an opefator for the New Orleans Police Department (“NOPD”), briefly testified for the purpose of authenticating the 911 incident recall sheet and,audio recording of the 911 call received on June 5, 2015. Thereafter, the 911 recording was published to the trial court.
On the 911 recording, the caller identifies himself as Emmanuel Henry, Jr. Mr. Henry can be heard reporting the incident as follows: “My son was just coming from around the corner and the neighbor down the street, he [defendant] pulled a gun out on my son [... ] just now and jumped into his car and pull[ed] off.” When the operator asks for the name of the neighbor, Mr. Henry replies: “I don’t even know his name, ma’am. He has a house on Bundy Road. And this guy.. .my son was just coming from around the corner, coming from by his friend’s house. I’m watching him come from around the corner and walk down the street. I’m watching him get on the side from the man cause he see the gun and the man started pointing a gun at him.” Mr. Henry reports that the incident happened outside the neighbor’s house at 4758 Bundy Road and that his son lives at 4726 Bundy Road. Mr. Henry also tells the operator that the neighbor does not live at the house on Bundy Road and only comes by to cheek on his property. The |soperator then asked Mr. Henry to provide a description of the neighbor, the car he was driving, and the direction in which Mr. Henry last saw the car.
NOPD Detective Charles Love testified that he conducted the investigation into the incident reported in the 4700 block of Bundy Road on June 5, 2015. When he arrived at the scene of the reported inci *727 dent, Det. Love spoke with Officer Sartan, the responding officer, and then spoke with the alleged victim, Emmanuel, and Mr. Henry. Based on the statements he obtained, Det. Love determined that the owner of the house at 4758 Bundy Road had perpetrated an aggravated assault upon Emmanuel. Det. Love used his NOPD mobile data terminal to obtain a name and photograph of the owner of the house, defendant. Det. Love sent the photograph to the Louisiana State Police to have a six-person photographic lineup prepared, and he arranged for Emmanuel to meet with Det. Guient at the Seventh District Station to view the lineup. Det. Love later learned that Emmanuel made a positive identification of defendant from the photographic lineup. Based on the statements and identification, Det. Love obtained an arrest warrant for defendant for the offense of aggravated assault. At that point, Det. Love’s investigation was concluded.
NOPD Det. Dorjius Guient testified that he met with Emmanuel at the -Seventh District Station on June 9, 2015, at approximately 5:30 p.m. to present the six-person photographic lineup. Det. Guient identified the envelope and photographic lineup presented to Emmanuel and he explained the procedure that he | ¿followed for presenting it. Det. Guient testified that Emmanuel identified the photograph of defendant as the person who pointed a gun at him on June 5,2015.
NOPD Det. James Kish testified that he executed the arrest warrant for defendant. At the scene of the arrest, Det. Kish confiscated a firearm belonging to defendant with his permission. Det. Kish then transported defendant to the Seventh District Station and conducted a video-recorded interview with defendant. Prior to questioning, Det. Kish informed defendant of his Miranda rights. Defense counsel stipulated that defendant gave a voluntary statement to Det. Kish. At that time, defendant’s video-recorded interview was played for the trial court.
At the beginning of the interview, Det. Kish informs defendant that he was arrested pursuant to a warrant for aggravated assault and that he is accused of “pulling a gun on somebody in front of your house” on Friday, June 5, at 9:00 p.m. Det, Kish asks defendant if he has ever pulled a gun on anyone and the defendant replies that he has never done so. Defendant states that he has been an Orleans Parish Sheriffs Office Reserve Deputy since 1984 and has a commissioned firearm, which is the one that Det, Kish confiscated from defendant’s truck. Defendant repeatedly states that he has no idea what the accusation and his arrest are about. Det. Kish asks defendant if he has ever had any problems or confrontations with anyone in his neighborhood on Bundy Road. Defendant states that he recalls one recent night at about 9:30 p.m. when he went to his house with his girlfriend to check the mail, and he recounted the following: “I was checking my mail and this guy just came out of nowhere and started talking to me and I told |7him, sir just get away from me, I don’t know you, get away from me.” Det. Kish asks again whether defendant got into a confrontation or pulled a gun on that person or anyone that defendant could recall. Again, defendant denied such accusation, but stated, “the only thing I can remember is the guy coming out of nowhere and I said leave me alone, I don’t know you.” Det. Kish then left the room for several minutes to take a phone call. Upon returning, he asks defendant why someone would pick him out of a six-person photographic lineup and say that he pulled a gun. Defendant states: “Well I’m just saying the guy that the other night when I was checking my mail, the guy that I told get away from me I guess that he’s *728 the only one, that’s the only thing that happened a couple of days ago.” Det. Kish asks if defendant was armed with his gun at the time, and defendant admits that he had his gun on his person that night. Det. Kish then questions defendant as follows:
Det. Kish: But at no point, you’re saying at no point you pulled that weapon out.
Defendant: I didn’t pull the weapon out on the guy, I didn’t pull it out on him.
⅜‡⅜
Det. Kish: Ok, that’s what I’m going with, so you’re saying at no point in time you pulled it out, pointed it, anything, you never showed it?
Defendant: I never pointed it at nobody, none of that, never did that, no.
Det. Kish: Was it concealed? Where was it on your person?
Defendant: Well, to be honest with you, when I got out the car, cause you know, living in that neighborhood is kinda [sic] bad, |sok. When I got out the car that night, you know, it’s 9:40 at night, I literally, I walked out the car with the gun in my hand, but it was just in my hand, it was in my right hand.
Det. Kish: So you did have it in your hand?
Defendant: Yeah, it was in my hand but I didn’t point it at nobody.
Defendant also stated that his girlfriend, Dr. Jan Cooper, was with him that night, and she was in the car, her gold Mercedes, when this occurred. Det. Kish stated that he would talk with her and ask what she saw. Det. Kish also confirmed with defendant that the gun confiscated from his truck was the one he had with him on the night in question. Finally, Det. Kish asked defendant why he did not say in the beginning of the interview that he got out of the car with the gun in his hand. Defendant replied that he was “just nervous,” he has never been arrested before, and he repeated that he didn’t pull the gun out on anyone, because it was already in his hand.
Defense counsel called two witnesses to testify at trial. Dr. Jan Cooper testified that she is defendant’s girlfriend of fifteen years and, since Hurricane Katrina, defendant has been living at her house but still owns a house on Bundy Road. On the evening of June 5, 2015, she and defendant had gone out to dinner and stopped at a store; then, defendant wanted to check the mail at his house on Bundy Road before going back to her house. Defendant drove her car to his house, pulled into the driveway, and he got out while she remained in the car. Dr. Cooper explained that defendant’s house is the second from the comer of Bundy Road and | ¡¡Hammond Street, but the lot on the corner is a vacant lot.[3] While she waited in the car, she saw a man [Emmanuel] walking at a brisk pace on Hammond and turn the corner onto Bundy Road towards them. She watched Emmanuel as he approached; she saw his right hand in his pocket and it appeared that he was holding something up to his chest. Then, she saw Emmanuel walk towards defendant, who was standing at the mailbox, and stop. At this point, she turned to her left to look behind the car to see what was happening. Dr. Cooper stated that, at first, she was concerned that Emmanuel meant to rob them, but it appeared to her that defendant and Emmanuel were just standing there talking. She testified that she could see Emmanuel’s right side and his back and defendant’s left side but not his right side or his right arm. While the two men were speaking to one another, *729 Dr. Cooper saw another man, Mr. Henry, standing about two or three houses up the street on the sidewalk frantically waiving towards defendant and Emmanuel. When she looked back at defendant, he was almost back to the car. Defendant got in the car and quickly drove off in the wrong direction on Bundy Road.
Dr. Cooper testified that she did not see defendant with a gun that night. She stated that she knew defendant often had his gun with him, but she did not notice if he had it with him when he got out of the car that night. She admitted that she could not hear anything that was said by either defendant or Emmanuel, but she did not see defendant point a gun at Emmanuel.
^J^Officer Michael Sartan was the final witness called by defense counsel. Ofc. Sartan testified that he was the initial investigating officer at the scene of the incident on June 5, 2015. Ofc. Sartan acknowledged that he spoke to “an independent witness” to the incident, but Ofc. Sartan was not permitted to testify regarding any statements made by that non-testifying witness.
In consideration of the above testimony and evidence presented at trial, the trial court found defendant guilty of aggravated assault, a responsive verdict to the charged offense.
DISCUSSION
Sufficiency of the evidence
By his first assignment of error on appeal, defendant argues that the State failed to prove the essential elements of the offense of aggravated assault beyond a reasonable doubt and, thus, there is insufficient evidence to sustain his conviction.
When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts apply the standard enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under that standard, the appellate court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that all of the elements of the offense had been proven beyond a reasonable doubt. Id.; State v. Tate, 01-1658, p. 4 (La. 5/20/03), 851 So.2d 921, 928.
The reviewing court must consider the whole record, just as the rational trier of fact considers all of the evidence, and the actual trier of fact is presumed to have |nacted rationally. State v. Mussall, 523 So.2d 1305, 1310 (La. 1988). “If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted.” State v. Egana, 97-0318, p. 6 (La.App. 4 Cir. 12/3/97), 703 So.2d 223, 228; State v. Green, 588 So.2d 757, 758 (La. App. 4th Cir. 1991); Mussall, supra. It is not the function of the appellate court to assess the credibility of witnesses or reweigh the evidence. State v. Scott, 12-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So.3d 501, 508, citing State v. Johnson, 619 So.2d 1102, 1109 (La. App. 4th Cir. 1993). Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the trier of fact. Id., citing State v. Brumfield, 93-2404 (La. App. 4 Cir. 6/15/94), 639 So.2d 312, 316. “Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.” Id., citing State v. Jones, 537 So.2d 1244, 1249 (La. App. 4th Cir. 1989). “Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion.” *730 State v. Marshall, 04-3139, p. 9 (La. 11/29/06), 943 So.2d 362, 369, citing State v. Legrand, 02-1462, p. 5 (La. 12/3/03), 864 So.2d 89, 94.
In this case, defendant argues that the evidence is insufficient to support his' conviction for aggravated assault, which is defined as an assault committed with a | ^dangerous weapon,[4] because the State failed to prove the elements of assault. An assault is defined “as an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery.” La. R.S. 14:36.[5] In order to support a conviction for assault, the State must prove beyond a reasonable doubt: (1) the intent-to-scare mental element (general intent); (2) conduct by defendant of the sort to arouse a reasonable apprehension of bodily harm; and (3) the resulting apprehension on the part of the victim. State in the Interest of K.M., 14-0306, p. 9 (La.App. 4 Cir. 7/23/14), 146 So.3d 865, 872, citing State v. Tatom, 463 So.2d 35, 37 (La App. 5th Cir. 1985); State v. Roebuck, 543 So.2d 573, 574 (La. App. 4th Cir. 1989). Defendant asserts that the evidence is insufficient to prove any of the three elements.
With regard to the first element, defendant argues that there is insufficient evidence to indicate that he intended to place the victim, Emmanuel, in imminent fear of receiving a battery. Defendant contends that the evidence indisputably establishes that he went to his house that night to retrieve his mail and he legally carried his weapon with him as a means of protection and precaution.
Assault requires proof of only general criminal intent or a showing that the defendant, in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act. La. R.S. 14:10(2); State v. Hill, 35,013, pp. 5-6 (La.App. 2 Cir. 9/26/01), 796 So.2d 127, 131-32; State v. Johnston, 207 La. 161, 20 So.2d 741, 744-45 (1944). “An offender has the requisite intent when the prohibited result may have reasonably been expected to follow from the offender’s voluntary act, regardless of any subjective desire on his part to have accomplished the result.” State v. Amos, 15-0954, p. 11 (La.App. 4 Cir. 4/6/16), 192 So.3d 822, 829, citing State v. Smith, 07-2028, p. 10 (La. 10/20/09), 23 So.3d 291, 298.
The record establishes that the charge against defendant was based on the allegation that defendant pointed his gun at Emmanuel and telling him, “I’ll knock your head in the dirt.” During trial, Emmanuel gave direct testimony to that effect and indicated to the court the manner in which defendant was pointing the gun. Mr. Henry corroborated Emmanuel’s testimony, testifying that he witnessed defendant pointing a gun at Emmanuel. The trial court also heard Mr. Henry’s consistent statement on the 911 call recorded right after the incident occurred. The act of pointing a weapon at another person and threatening bodily harm is sufficient to establish intent of aggravated assault. State v. Hill, 47,568, p. 11 (La.App. 2 Cir. 9/26/12), 106 So.3d 617, 624 (“Aiming a pistol at a victim from point blank range and threatening to „blow his brains out’ satisfies the level of proof required for conviction, if believed by the trial court.”); State v. Connors, 432 So.2d 308 (La. App. 5th Cir. 1983) (aggravated assault occurred when defendant intentionally raised the *731 gun as if to aim it at victim and thereby-placing victim in reasonable apprehension of receiving a battery). Although defendant argues that his voluntary statement and Dr. Cooper’s testimony support his contention that he ludid not point his gun at Emmanuel, the trial court was in the best position to determine witness credibility and weight of the evidence. Based on the testimony that defendant pointed the gun and made a threatening statement to Emmanuel, we find the record contains sufficient evidence to establish the intent-to-scare element of assault.
As to the second and third elements of assault—the victim’s reasonable and actual apprehension of bodily harm—the defendant asserts that Emmanuel’s cross-examination testimony reveals that Emmanuel did not fear any bodily harm from defendant as long as he did not do anything to threaten defendant. In support of this assertion, defendant cites the following excerpt of Emmanuel’s testimony:
Q: Now, one of the things that stood out in your direct testimony that you only— you only thought he was going to shoot you if you tried something. Do you remember saying that in your direct testimony?
A: Correct.
Q: So when you say “tried something,” like if you tried to do [defendant] some harm? What do you mean by “trying something”? He only was going to shoot you if you tried something.
A: Right. You know, maybe if I would have probably tried to walk like, you know, around him or something like that. He probably thought in his mind I was trying to do him something.
Q: So as long as you didn’t do him something, you were pretty much free to go?
A: I figuring I was, you know—I was minding my business. He was minding his. I was trying to get to my house.
Q: The main thing is, as long as you didn’t try nothing, you didn’t think he was going to shoot you, did you?
A: Correct. But I had no—you know, I didn’t think—I wouldn’t try nothing.
| ^Defendant also cites two cases in support of his argument that there is insufficient evidence of the victim’s reasonable and actual apprehension of receiving a battery; however, we find both cases are factually inapposite to the instant case.
In State in Interest of Tatom, 463 So.2d 35 (La. App. 5th Cir. 1985), the Court reversed the juvenile defendant’s conviction for aggravated assault upon finding that the State failed to establish the third element—actual apprehension of receiving a battery—when the victim testified that he was not afraid that defendant would shoot him. Specifically, the Court found as follows:
[T]he victim explicitly testified he was never afraid throughout the entire confrontation and further that when defendant pointed the gun at him he challenged defendant to shoot him because he did not believe defendant had the guts to do it. Neither the State nor the record provides any circumstantial evidence that the victim exhibited any behavior indicative of apprehension.
Id. at 37.
In State v. Rideau, 05-0462 (La.App. 4 Cir. 12/6/06), 947 So.2d 127, this Court reversed one of defendant’s convictions for aggravated assault upon a peace officer, because the victim of that aggravated assault did not testify at trial. This Court held that the fact of whether the victim of an aggravated assault had reasonable apprehension of receiving a battery must be *732 proven by direct evidence of that victim’s state of mind.
In contrast to those two cases, the record of this case provides direct testimony from the vietim that he had reasonable and actual apprehension of receiving a battery. Although defendant highlights Emmanuel’s statement that he 11fibelieved defendant would shoot him “if [Emmanuel] was to try something,” we find that Emmanuel’s direct testimony in full context provides ample direct evidence of his reasonable and actual apprehension of being shot by defendant. We note the following excerpts of Emmanuel’s testimony:
Q: Now, when you first saw [defendant], what were you doing?
A: I was walking on the sidewalk.
[[Image here]]
Q: And what happened when you approached [defendant] on the sidewalk? Where was he at?
* * *
A: Well, when I was on the corner, I saw him at his mailbox. [... ] as I was walking, he, you know, still was at his mailbox... just waiting for me to pass.
Q: Did you notice if [defendant] had a gun on him at the time?
A: I didn’t see the gun until, you know, I got a little closer.
Q: [... ] And what happened after you got a little closer to [defendant]?
A: As I was walking, he was still at his mailbox. I looked and he looked and then he was like “keep it moving, son. I’ll knock you head in the dirt” and I was like, “hey, I ain’t trying to do nothing. I’m just trying to go home,” and I put both of my hands up.
Q: Why did you put both of your hands up?
A: Because he had a weapon.
Q: And what was he doing with the weapon when he said he was going to knock your head in the dirt?
[[Image here]]
A: He just had it [... ] facing like my stomach or like—you know, just like that in his hand (indicating).
Q: So he had the gun pointed at you?
A: Yes.
|17Q; And what did you think he meant with the gun pointed at your stomach when he said that statement he was going to knock you—knock your head in the dirt?
⅝ * *
A: I believed he was going to shoot me if I was to try something or anything.
[[Image here]]
Q: How did you feel when he pointed the gun at you?
A: I was scared because [... ] I felt like he was going to shoot me.
Emmanuel’s direct testimony of his actions, reaction, and state of mind establish that he was in actual apprehension of being shot by defendant. In addition, Mr. Henry’s testimony and his call to 911 to immediately report this incident provide additional evidence of the second element that Emmanuel had an objectively reasonable apprehension of receiving a battery due to defendant’s conduct. See State v. Boutte, 10-1257, pp. 5-6 (La.App. 3 Cir. 5/11/11), 65 So.3d 793, 796-97 (although victim did not testify that he saw the gun or feared being shot, victim’s testimony regarding his actions immediately after the gunshot—that he immediately complied with defendant’s demands and called the police as soon as defendant left—was sufficient evidence to establish victim’s apprehension of receiving a battery).[6] Thus, we *733 find that the evidence presented to the trial court was sufficient to prove the second and third elements of assault.
iisUpon review of the testimony and evidence presented to the trial court, we find the record contains sufficient evidence of all three elements of the offense of aggravated assault.
Self-defense
In his next assignment of error, defendant argues that the State failed to prove that his conduct was not justifiable as an act of self-defense. Defendant asserts that he acted reasonably under the circumstances of the late night encounter with a stranger, Emmanuel, whom he claims was acting in a suspicious and threatening manner.
Under Louisiana law, “[t]he fact that an offender’s conduct is justifiable, although otherwise criminal, shall constitute a defense to prosecution for any crime based on that conduct.” La. R.S. 14:18. In addition, the use of force or violence upon the person of another is justifiable when committed for the purpose of preventing a forcible offense against the person, provided that the force or violence used must be reasonable and apparently necessary to prevent such offense. La. R.S. 14:19(A).
When a defendant asserts that he acted in self-defense in a homicide case, it is settled law that the State bears the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense. State v. Jefferson, 04-1960, p. 10 (La.App. 4 Cir. 12/21/05), 922 So.2d 577, 587-88, citing State v. Osborne, 00-0345, p. 7 (La.App. 4 Cir. 12/6/00), 775 So.2d 607, 611; State v. Taylor, 03-1884, p. 7 (La. 5/25/04), 875 So.2d 58, 63. In a non-homicide case, however, the | ^Louisiana jurisprudence is not settled definitively on the issue of who has the burden of persuasion in proving self-defense. Jefferson, 04-1960, p. 10, 922 So.2d at 588; State v. Boudreaux, 08-1504, pp. 30-32 (La.App. 4 Cir. 9/29/10), 48 So.3d 1144, 1161-62.
In State v. Freeman, 427 So.2d 1161, 1163 (La. 1983), the Louisiana Supreme Court stated that “in the non-homicide situation, the defense of self-defense requires a dual inquiry; an objective inquiry into whether the force used was reasonable under the circumstances; a subjective inquiry into whether the force was apparently necessary.” The Court then indicated, in dicta, that the burden of persuasion in proving self-defense in a non-homicide situation “could arguably [... ] be upon the defendant since a subjective inquiry is involved.” Id. However, the Court concluded that it need not resolve the issue, “for irrespective of who bears the burden in this case, and even assuming that the State has the burden of proving beyond a reasonable doubt in this non-homicide situation that defendant did not act in self-defense, we conclude that the State has carried its burden of proof.” Id.; See also, State in Interest of A.W., 13-1198 (La.App. 4 Cir. 3/13/14), 137 So.3d 728. (finding that, regardless of who carries the burden of proof on self-defense in a non-homicide case, the State carried its burden of proving defendant committed a battery, and the evidence and testimony was undisputed that the victim did not threaten defendant with physical contact at any time during the incident); Boudreaux, 08-1504, *734 p. 32, 48 So.3d at 1162 (concluding that, whether the State or defendant bore the burden of proving that | ^defendant did not act in self-defense, there was sufficient evidence to prove beyond a reasonable doubt that defendant did not act in self-defense).
Similarly, in this case, we find that irrespective of who bears the burden of proving that defendant acted in self-defense in this non-homicide situation, any rational trier of fact could have concluded beyond a reasonable doubt that defendant did not act in self-defense. The testimony at trial was undisputed that Emmanuel was unarmed and he made no verbal or physical threats to defendant at any time during the incident. Also, despite defendant’s claim that he felt threatened and acted out of fear for his personal safety, we note that defendant failed to report the encounter to police and he was less than forthcoming about the details of this incident during his interview with Det. Kish. Viewing all the testimony and evidence in the light most favorable to the prosecution, we find sufficient evidence for the trial court to conclude beyond a reasonable doubt that defendant did not act in self-defense.
Exclusion of Impeachment Evidence
In his final assignment of error, defendant argues that the trial court erred by excluding relevant impeachment evidence pursuant to La. C.E. Art, 607(D)(2). Defendant argues that he was denied the opportunity to introduce extrinsic evidence contradicting Emmanuel’s testimony, when the trial court refused to allow Ofc. Sartan to testify regarding a statement made to him by another neighbor who witnessed the incident.
|2iOfc. Sartan testified that he spoke to an independent witness to the incident—an unidentified neighbor—and she conveyed to Ofc. Sartan what she heard that night. When the defense questioned Ofc. Sartan regarding the content of the statement given by that non-testifying witness, the State objected on the basis that defense was attempting to elicit hearsay. The defense countered that Ofc. Sartan’s testimony regarding the neighbor’s statement was allowed under La. C.E. Art. 607(D)(2), which permits extrinsic contradictory evidence to impeach a witness’s credibility. The trial court sustained the State’s hearsay objection.
Louisiana law permits the impeachment of a witness in a criminal trial by his or her prior inconsistent statements and evidence contradicting the witness’ testimony. See La. C.E. Art. 607(D)(2). “If the probative value outweighs any undue prejudice, extrinsic evidence of the prior statement is admissible, not to prove the truth of the matter asserted, but to establish the fact of contradiction as a means of impeaching the witness’s general credibility.” State v. Ross, 11-1668, p. 6 (La.App. 4 Cir. 6/4/14), 144 So.3d 1118, 1123; see State v. Cousin, 96-2973 (La. 4/14/98), 710 So.2d 1065, 1071 (“When the testimony of a witness in court is inconsistent with a prior statement by the witness, the party calling the witness may be able to use the prior statement to impeach the witness-that is, to diminish his or her credibility.”).
In this case, however, the statement made by the independent witness to Ofc. Sartan was not proper impeachment evidence under La. C.E. Art. 607(D)(2) because it was not a prior inconsistent statement or contradictory evidence of any Isstestimony given by Ofc. Sartan. Here, the defense sought to introduce a statement made to Ofc. Sartan by another witness as a means of contradicting Emmanuel’s testimony of what defendant said to him. However, since the witness who made the statement did not testify at trial and was not subject to cross-examination concerning the statement, we find no error in *735 the trial court’s ruling sustaining the State’s hearsay objection. See La. C.E. Art. 801(D)(1).
CONCLUSION
For the foregoing reasons, we find no merit in defendant’s assignments of error and we affirm defendant’s conviction and sentence.
AFFIRMED

. Also, our review revealed no errors patent on the face of the record. La. C.Cr.P. Art. 920.

. Mr. Henry testified that he resides at 3265 Belford Avenue but his son, Emmanuel, resides at 4726 Bundy Road.

. Dr. Cooper identified a photograph of the house. The photograph shows a driveway along the side of the house next to the vacant lot, and the mailbox for the house appears to be on the driver side of the driveway between the sidewalk and the street.

. La. R.S. 14:37.

S. A battery is defined, in pertinent part, as "the intentional use of force or violence upon the person of another.” La. R.S. 14:33.

. Also, in State v. Blaise, 504 So.2d 1092 (La. App. 5th Cir. 1987), the Fifth Circuit found *733 that circumstantial evidence alone was sufficient to sustain defendant's conviction for aggravated assault. The Court noted that the lack of testimony from the victim as to whether or not she was apprehensive was not necessarily dispositive of the issue. The Court reviewed the victim’s actions when the defendant came into the barroom brandishing a gun and determined that her actions clearly established her apprehension, including, as in this case, the victim's action of immediately reporting the incident to the police.