STATE OF LOUISIANA        *        NO. 2025-KA-0230

VERSUS                *

                              COURT OF APPEAL

JERMAINE BRISCO       *

                              FOURTH CIRCUIT

                *

                              STATE OF LOUISIANA

                * * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 552-969, SECTION "B"
Honorable Tracey Flemings-Davillier
* * * * * *
**Judge Nakisha Ervin-Knott**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Nakisha Ervin-Knott, Judge Monique G. Morial)

Jason R. Williams
District Attorney
Brad Scott
Chief of Appeals
Zachary M. Phillips
Assistant District Attorney
Parish of Orleans
619 S. White St.,
New Orleans, LA 70119

      COUNSEL FOR STATE OF LOUISIANA/APPELLEE

Christopher A. Aberle
LOUISIANA APPELLATE PROJECT
P.O. Box 8583
Mandeville, LA 70470-8583

      COUNSEL FOR DEFENDANT/APPELLANT

      **CONVICTIONS AFFIRMED; REMANDED WITH INSTRUCTIONS**
                                  **January 20, 2026**

Defendant, Jermaine Brisco, appeals his convictions of second degree murder, first degree feticide, and attempted obstruction of justice. For the following reasons, we affirm Defendant's convictions and remand with further instructions.

## PROCEDURAL HISTORY

On the evening of November 9, 2016, Raven Veal was shot in the face and run over multiple times by her own vehicle. At the time of her gruesome murder, Ms. Veal was nine months pregnant.

On December 9, 2021, the grand jury charged Defendant with the following:

- **Count 1**: Second degree murder in violation of La. R.S. 14:30.1;

- **Count 2:** First degree feticide in violation of La. R.S. 14:32.6;

- **Count 3:** Cruelty to a juvenile in violation of La. R.S. 14:93; and

- **Count 4:** Obstruction of justice by tampering with evidence in a second degree homicide investigation in violation of La. R.S. 14:130.1.

1

Defendant's case proceeded to a jury trial on November 4, 2024, and ended November 8, 2024.[1] At the conclusion of trial, the jury found Defendant guilty as charged on Counts 1 and 2, guilty of the lesser offense of attempted obstruction of justice on Count 4, and not guilty on Count 3.

Thereafter, Defendant filed a Motion for New Trial and for Post-Verdict Judgment of Acquittal. The district court denied the motion and sentenced Defendant on December 13, 2024. He received a life sentence on Count 1, a fifteen year sentence on Count 2, and a twenty year sentence on Count 4. This timely appealed followed.

**ERRORS PATENT**

Prior to reviewing the merits of this appeal, we are tasked with examining the record for any errors patent in accordance with La. C.Cr.P. art. 920.[2] Our review of the record reveals two errors patent, one of which is raised by Defendant as an assignment of error.

First, we note an error with Defendant's sentences for Counts 2 and 4—the feticide and attempted obstruction of justice convictions. The district court sentenced Defendant to fifteen years for the crime of first degree feticide and twenty years for the crime of attempted obstruction of justice. The district court specified that both of these sentences were to be served without the benefit of probation, parole, or suspension of sentence. However, neither of the statutes for those crimes authorize the restriction of benefits. *See* La. R.S. 14:32.6 and La. R.S. 14:130.1. When a lower court imposes a sentence beyond the limits of what the

---

[1] Defendant's case was tried before a jury twice prior to the trial subject to this appeal. His first trial ended in a hung jury on all counts on October 7, 2022. His second trial ended in a mistrial on November 2, 2023 because of a juror's misconduct during deliberations.

[2] An error patent is an error "that is discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La. C.Cr.P. art. 920(2).

legislature has authorized, the appellate court should correct the illegal sentence. *State v. Sanders*, 2004-0017 (La. 5/14/04), 876 So. 2d 42; *see also State v. Harris*, 2023-233, pp. 8-9 (La. App. 5 Cir. 12/27/23), 379 So. 3d 152, 159. Additionally, as noted by Defendant's appellate counsel, there is a discrepancy between the minute entry and the transcript on the jury's verdict for Count 3, cruelty to a juvenile. The minute entry notes that Defendant was found guilty on Count 3, whereas the transcript provides that the jury returned a verdict of not guilty. Whenever there is a discrepancy between a minute entry and the transcript, the transcript rules. *State v. Bailey*, 2012-1662, p. 6 (La. App. 4 Cir. 10/23/13), 126 So. 3d 702, 706 (citing *State v. Lynch*, 441 So. 2d 732, 734 (La. 1983)).

In light of these errors, we amend Defendant's sentences on Counts 2 and 4 to remove the restriction on benefits. We remand this case back with instructions for the district court to (1) edit the minute entry to reflect Defendant was found not guilty on Count 3; (2) edit the minute entry to remove the restrictions on Defendant's sentences for Counts 2 and 4; and (3) transmit notice of the amended sentences for Counts 2 and 3 to the appropriate authorities pursuant to La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department.

We now turn to the errors raised by Defendant on this appeal.

## ASSIGNMENTS OF ERROR

***Counsel Assigned Errors:***

1. There is a discrepancy between the minute entry and the trial transcript regarding the verdict on Count 3.

2. The evidence is insufficient to support Defendant's convictions on Counts 1 and 4.

3. The evidence is insufficient to support Defendant's conviction on Count 2.

*Pro Se Assigned Errors:*

1. The district court erred in permitting the admission of the first forensic interview of R.R. [3], through the testimony of a law enforcement officer.

2. The district court erred in permitting the second forensic interview of R.R. through the testimony of a law enforcement officer.

3. The district court erred in allowing a law enforcement officer to present hearsay-based and speculative opinion testimony regarding the surveillance video timestamps.

4. The district court violated Defendant's constitutional rights by allowing the State to use an undisclosed law enforcement database and out-of-court statements at trial.

5. The district court erred in denying Defendant's Motion for Post-Verdict Judgment of Acquittal because the State failed to prove the Defendant's guilt beyond a reasonable doubt, and the evidence at trial left substantial reasonable doubt as to Defendant's identity as the perpetrator.

6. The district court erred in allowing a detective to offer lay opinion testimony regarding the presence or availability of DNA evidence.

7. The district court erred in allowing the prosecutor to mislead the jury during closing argument by suggesting that a co-defendant had exclusive knowledge of the evidence.

## DISCUSSION

***Counsel Assigned Errors Nos. 2-3; Pro Se Error No. 5: Whether the evidence presented at trial was sufficient to convict Defendant***

We first address Defendant's counsel assigned errors nos. 2-3 and *pro se* error no. 5 as these deal with the sufficiency of the evidence admitted during trial. Defendant's counsel assigned errors challenge the evidence used to convict him of murder, attempted obstruction of justice, and feticide. Defendant's *pro se* error

---

[3] R.R. was approximately four years old when she witnessed her mother's murder. Given R.R.'s minor status, and in accordance with La. R.S. 46:1844(W)(1)(a), we will refer to her by her initials.

additionally challenges whether the evidence on all these counts was sufficient to identify him as the perpetrator of the crimes.[4]

If a challenge to the sufficiency of the evidence is raised on appeal, the appellate court must address that assignment of error first. *State v. McDonough,* 2022-0628, p. 21 (La. App. 4 Cir. 10/27/23), 376 So. 3d 1003, 1019 (citation omitted). In reviewing such a claim, the appellate court must view all of the evidence in a light most favorable to the prosecution and determine whether any rational trier of fact could have found all of the elements of the crime to have been proven beyond a reasonable doubt. *Id.*, p. 21, 276 So. 3d at 1020 (quoting *State v. Groves*, 2020-0450, p. 21 (La. App. 4 Cir. 6/10/21), 323 So. 3d 957, 971). The appellate court does not reweigh the evidence or make credibility determinations in its review. *State v. Dukes*, 2019-0172, p. 8 (La. App. 4 Cir. 10/2/19), 281 So. 3d 745, 752 (citing *State v. McGhee*, 2015-2140, p. 2 (La. 6/29/17), 223 So. 3d 1136, 1137). Any conflicting evidence or testimony as to a factual matter is a question of the weight of that evidence, not its sufficiency. *Id.* (quoting *State v. Scott*, 2012-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So. 3d 501, 508). "Absent [an] internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion." *State v. De Gruy*, 2016-0981, p. 11 (La App. 4 Cir. 4/5/17), 215 So. 3d 723, 729 (quoting *State v. Marshall*, 2004-3139, p. 9 (La. 11/29/06), 943 So. 2d 362, 369).

---

[4] Defendant's *pro se* assignment of error no. 5 asserts the district court's denial of his motion for post-verdict judgment of acquittal was erroneous because the evidence was insufficient to identify him as the perpetrators of the crimes.

### i. Count 1: Second degree murder in violation of La. R.S. 14:30.1

Second degree murder occurs when the perpetrator kills a person while having the specific intent to either kill or inflict great bodily harm upon the victim. La. R.S. 14:30.1(A)(1). A perpetrator is deemed to have specific intent when the circumstances and actions of the perpetrator indicate that he actively desired the prescribed criminal consequences to follow his act. *State v. Gary*, 2016-0714, pp. 2-3 (La. App. 4 Cir. 5/3/17), 220 So. 3d 117, 119 (citations omitted).

Duvuri Devall, a former co-defendant in this case, was a direct witness to the crimes committed by Defendant on November 9, 2016.[5] Devall attested that he and Defendant were high school friends and worked together as deckhands on the Mississippi River. He confirmed that he was with Defendant the night of Ms. Veal's murder, riding as a passenger in Defendant's vehicle, a black Chevy Malibu. The two went to Walmart where Defendant met with Ms. Veal to shop for baby clothes.[6] Eventually, after making one other stop, Defendant drove them down Patterson Drive along the river while Ms. Veal followed behind in her blue Ford sedan. After turning on to Sullen Place, Defendant stopped his vehicle and went to talk with Ms. Veal by her car. Devall stayed in Defendant's car. At some point, Defendant came back to his car, and Devall heard him remove an object from the backseat before returning to Ms. Veal. Soon thereafter, Devall heard a gunshot, and he exited the vehicle to see Defendant with a gun in his hand and Ms. Veal bleeding. He witnessed Ms. Veal try to fight off Defendant and Defendant follow Ms. Veal into her car as she attempted to escape the situation. Ms. Veal's

---

[5] Devall admitted to the jury that he had been given a plea deal in exchange for his testimony at trial.

[6] Devall did not accompany the two inside Walmart, opting to stay in Defendant's car. Ms. Veal's young daughter followed her and Defendant into the Walmart.

car pulled away, and, after a moment, Devall pursued the two in Defendant's vehicle. Devall attested that when he had caught up to the two, he saw Ms. Veal lying on the ground and bleeding as if she had been struck by a car. Defendant, while still in Ms. Veal's car, ran over her again before fleeing the scene. Dr. Cynthia Gardner, who performed the autopsy of Ms. Veal, confirmed to the jury that Ms. Veal's cause of death was internal bleeding due to multiple crush injuries to the pelvic area. [7]

Sergeants Daniel Hiatt and Robert Barrere both testified at trial regarding their investigation into Ms. Veal's murder. Both investigated the crime scene after the murder. Sgt. Hiatt attested that Ms. Veal's bloody car was found approximately a neighborhood away from where the crime had occurred. Both Sgts. Hiatt and Barrere witnessed the forensic interview the Children's Advocacy Center ("CAC") conducted with R.R., Ms. Veal's minor daughter who was with her the night of the murder. During the first interview, R.R. said "Jaycee's daddy" was the person who had harmed her mother. Through his investigation, Sgt. Barrere found evidence linking Defendant as "Jaycee's daddy," and, during the second forensic interview, R.R. identified Defendant as "Jaycee's daddy" in a photographic line-up. Surveillance video collected by Sgt. Barrere was also shown to the jury. The video depicted a black Chevy Malibu following behind a blue Ford sedan moments after the murder, lending credence to Devall's testimony. Moreover, Charles Dionne, a crime analyst assisting with the investigation, conducted an analysis of the data received from Defendant's and Devall's phones. He testified that both Defendant's and Devall's phones pinged phone towers that encompassed the crime scene.

---

[7] Dr. Gardner also testified that Ms. Veal had a superficial gunshot wound on her face, but the gunshot wound did not cause her death.

Finally, the State introduced the testimony of Michaela Anthony, the regional vice president of Primerica Financial Services ("Primerica"). Ms. Anthony attested that she trained Defendant to be a life insurance agent for the company. In September 2016, Defendant attempted to obtain a $250,000.00 life insurance policy on Ms. Veal. Initially, Ms. Anthony refused to issue the policy, but Defendant went behind her back and attempted to have other agents issue the policy to him.

After Ms. Veal reinstated her personal life insurance policy with Primerica, she transferred ownership of that policy to Defendant. Defendant went to the office with Ms. Veal on a day Ms. Anthony was away, and the couple filled out a policy change form that named Defendant both owner and beneficiary of Ms. Veal's policy. Thereafter, Defendant attempted to increase the limits on Ms. Veal's policy twice, with a final request to increase the policy limit to $400,000.00. Ms. Anthony testified that she was never able to verify with Ms. Veal if she wanted those policy increases. Further, when she discussed the budget for Ms. Veal's policy with Defendant, Defendant indicated that he did not have a budget for her policy, despite having a budget for his own policy.

Ms. Anthony learned about Ms. Veal's death the morning after the murder when Defendant called one of her employees and indicated he would be in touch with her about Ms. Veal's policy. Defendant texted Ms. Anthony a few days later on November 12 with a news article about Ms. Veal's murder. After telling Defendant she would look into the matter, Ms. Anthony reported Defendant and the policy to the police as suspicious.[8]

---

[8] Ultimately, Defendant would not be able to collect on Ms. Veal's policy because the policy was not active the night of the murder. The payment Defendant had made toward her policy was

We find the above, collective evidence to be more than sufficient to convict Defendant of second degree murder. Mr. Devall witnessed Defendant attack and run over Ms. Veal the night of the murder, and his testimony was corroborated by the evidence collected by the NOPD during its investigation. Further, Ms. Anthony's testimony established a clear motive for the murder—financial gain through the life insurance policy.

In his counsel's brief, Defendant argues that Devall's testimony was not credible given the fact he testified as part of a plea deal to lessen the culpability of his own involvement. The record reflects the jury was aware that Devall was testifying as part of a plea deal. The jury heard testimony about Devall's plea deal, and defense counsel addressed the plea deal during cross-examination. Defendant's argument goes to the weight the jury afforded to Devall's testimony, not its sufficiency. Moreover, as outlined above, Devall's testimony, while sufficient, was not the only evidence presented to the jury in order to prove Defendant's crimes. In light of the record as a whole, the jury's finding was not unreasonable, and we affirm Defendant's second degree murder conviction.

### ii. Count 2: First degree feticide in violation of La. R.S. 14:32.6

First degree feticide is defined as the killing of an unborn child when the perpetrator had the specific intent to kill or inflict great bodily harm. La. R.S. 14:23.6(A)(1). The perpetrator's specific intent does not need to be directed at the unborn child. So long as the perpetrator intended to kill or harm the mother, that intent is attributed to the fetus as well. *State v. Houston*, 2025-145, p. 20 (La. App. 3 Cir. 11/5/25), ___ So. 3d ___, 2025 WL 3085386 at 11 (discussing the doctrine

---

redirected to his policy because his own policy had to be active before he could have a policy on another person. Defendant failed to send additional payment for Ms. Veal's policy.

of transferred intent for first degree feticide); *State v. Chatman*, 2023-187, pp. 22-23 (La. App. 3 Cir. 12/6/23), 376 So. 3d 301, 316, *writ denied*, 2024-00030 (La. 9/17/24), 392 So. 3d 631 (discussing whether a defendant's intent must be directed at the fetus). As discussed earlier, the evidence is more than sufficient to convict Defendant of the murder of Ms. Veal. Therefore, the evidence is also sufficient to establish he had the intention to commit first degree feticide as well.

On appeal, Defendant argues that the evidence was insufficient to prove that he caused the unborn child's death. This argument does not have merit. At trial, Dr. Gardner testified that Ms. Veal died due to internal bleeding from multiple crush injuries to the pelvic area. This is the same area of the body where the uterus and the unborn child were located. Further, a fetus' life is dependent on the well-being of its mother. Thus, the jury could reasonably find that the murder of Ms. Veal caused her unborn child's death. Given this, we affirm Defendant's conviction of first degree feticide.

### iii. Count 4: Obstruction of justice by tampering with evidence in a second degree homicide investigation in violation of La. R.S. 14:130.1.

Defendant was convicted of attempting to obstruct justice on Count 4. Obstruction of justice is generally defined as the "[t]ampering with evidence with the specific intent of distorting the results of any criminal investigation or proceeding which may reasonably prove relevant to a criminal investigation or proceeding." La. R.S. 14:130.1(A)(1). This includes the alteration or removal of substances from the scene of the crime as well as the alteration, destruction, or concealment of possible evidence. La. R.S. 14:130.1(A)(1)(a). In order to convict a defendant of this crime, the State only needs to show that the defendant knew that an act may reasonably affect a potential or future criminal proceeding. *State v.*

10

*Powell*, 2015-0218, p. 11 (La. App. 4 Cir. 10/28/15), 179 So. 3d 721, 728 (citing *State v. Jones*, 2007-1052, p. 9 (La. 6/3/08), 983 So. 2d 95, 101). Moreover, if the defendant possessed the requisite knowledge and intent, then "[n]othing beyond movement of the evidence is required" to obtain a conviction. *Id.* (internal quotation omitted). Finally, a defendant may be convicted of attempting to commit a crime if he had the specific intent to commit the prescribed crime and commits an action for the purpose of accomplishing that crime, regardless of whether he actually accomplished his purpose. La. R.S. 14:27(A).

In this case, the evidence presented shows that Defendant removed Ms. Veal's car and the gun from the scene of the crime. This was established through Devall, who witnessed Defendant driving from the scene, and the investigating officers, who confirmed that the vehicle was found in a different neighborhood from where the crime had occurred. Immediately after the murder, Devall assisted Defendant in cleaning the victim's car and wiping it down with bleach in an attempt to remove evidence. The next morning, Devall witnessed Defendant throw a suitcase containing his bloody clothes and the gun he used to shoot Ms. Veal into the Mississippi River, depriving the police from finding and using those items against him. Sgt. Barrere confirmed that he never recovered the gun that shot Ms. Veal. Finally, Defendant further attempted to distort the investigation by giving false information to the police on his whereabouts the night of the murder and telling Devall to do the same. Although he was ultimately unsuccessful in preventing the police from discovering his involvement, the evidence clearly establishes that Defendant attempted to disrupt the investigation into Ms. Veal's murder. Therefore, we find the evidence sufficient to convict Defendant of attempted obstruction of justice, and we affirm this conviction.

***Pro Se Errors Nos. 1-2: Whether the district court erred in admitting the forensic interviews of R.R. through the testimony of a law enforcement officer***

Defendant asserts in his *pro se* brief that the district court erred in admitting the two recordings of the CAC's forensic interviews with R.R. through the testimony of Sgts. Hiatt and Barrere. Defendant contends his Sixth Amendment right was violated by the introduction of the footage without either the interviewer or R.R. present for cross-examination. We review the district court's decision to admit this evidence for an abuse of discretion. *E.g. State v. Wright*, 2011-0141, pp. 10-11 (La. 12/6/11), 79 So. 3d 309, 316.

Louisiana Revised Statute 15:440.5 deems the video recording of a statement made by a protected person to be admissible if, among other things, the person who conducted or supervised the recorded interview is available to testify at trial and can be cross-examined. *See* La. R.S. 15:440.5(A)(6). In his *pro se* brief, Defendant argues that Sgts. Hiatt and Barrere were not qualified under the statute to admit the footage because they did not conduct the interview. This is not a novel argument. The jurisprudence on this issue dictates that an investigating officer can serve as the supervisor within the meaning of La. R.S. 15:440.5(A)(6). *State v. Hawkins*, 2011-0193, pp. 8-9 (La. App. 4 Cir. 11/16/11), 78 So. 3d 293, 298-99; *see also State v. Duong*, 2013-763, pp. 27-30 (La. App. 5 Cir. 8/8/14), 148 So. 3d 623, 639-41. As both Sgts. Hiatt and Barrere observed the interviews, they were qualified as supervisors within the meaning of La. R.S. 15:440.5(A)(6). Thus, Defendant's rights were not violated, and the district court did not err in admitting the video recordings of the interviews.[9]

---

[9] Louisiana Revised Statute 15:440.5(A)(8) also requires that the protected person who gave the interview be available to testify as a prerequisite for admissibility. Although R.R. did not testify at trial, the State indicated she was available for the defense to call to testify if it chose to do so.

***Pro Se Error No. 3: Whether the district court erred by allowing a law enforcement officer to present testimony regarding the surveillance video timestamps***

Defendant's third *pro se* assignment of error relates to Sgt. Barrere's testimony about the video surveillance footage of Jerred Griffin on the night of Ms. Veal's murder. Mr. Griffin was Ms. Veal's boyfriend and was originally believed by investigators to be the father of her unborn child. Both Sgts. Hiatt and Barrere testified that the investigation looked into Mr. Griffin as the potential perpetrator of Ms. Veal's murder. However, Mr. Griffin was excluded based on his alibi, which was confirmed by video surveillance footage depicting him at the locations he relayed to the investigators around the time of the murder. On appeal, Defendant argues that Sgt. Barrere could not testify regarding the time stamps on the video surveillance footage because his testimony about the footage was inadmissible hearsay and because he was not qualified as an expert in time stamp verification.

A prerequisite to admitting evidence is for it to be authenticated. *E.g. State v. Pollard*, 2014-0445, p. 16 (La. App. 4 Cir. 4/15/15), 165 So. 3d 289, 301 (citing La. C.E. art. 901); *see also Groves*, 2020-0450, p. 29, 323 So. 3d at 975. That is, the court must find that the evidence in question is what its proponent claims it to be. La. C.E. art. 901(A). The district court is afforded great discretion in determining whether a sufficient foundation has been laid to authenticate evidence. *Pollard*, 2014-0455, p. 17, 165 So. 3d at 301 (citation omitted). On review, the appellate court must determine whether the proponent established sufficient facts from which a reasonable juror could find the evidence to be authentic. *Groves*, 2020-0450, p. 29, 323 So. 3d at 976 (citation omitted).

One way evidence can be authenticated is through "the testimony of a witness with knowledge that the matter is what it claims to be." *Groves*, 2020-

13

0450, p. 29, 323 So. 3d at 975 (citing La. C.E. art. 901(B)(1)). The jurisprudence on this issue holds that the person who authenticates video footage does not have to be the same as the one who recorded the video so long as that person has knowledge that the video is what he claims it to be and can provide information about its contents. *State in Interest of K.B.*, 2023-0409, p. 21 (La. App. 4 Cir. 9/26/23), 372 So. 3d 864, 879, *writ denied* 2023-01421 (La. 4/3/24), 382 So. 3d 106. Herein, Sgt. Barrere testified that he personally went to each of the locations identified by Mr. Griffin and collected the surveillance footage from the respective areas as part of his investigation. He also was able to identify the contents of the footage, including each location and Mr. Griffin's "distinctive" vehicle. Given this, we find that a reasonable juror could have found the evidence to be authentic.

Evidence that is authenticated can be admitted as non-hearsay, substantive evidence. *Pollard*, 2014-0445, p. 17, 165 So. 3d at 301 (citing La. C.E. art. 801(D)(1)). Hearsay is "a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted." La. C.E. art. 801(C). An officer testifying at trial regarding the sequence of events that led him to the arrest of a perpetrator, for the purpose of explaining the course of his investigation and actions, is not hearsay. *State in Interest of K.B.*, 2023-0409, p. 32, 372 So. 3d at 885 (citation omitted). As the surveillance footage was properly authenticated by Sgt. Barrere, and because his testimony about the footage was for the purpose of describing how he eliminated a suspect, we do not find his testimony to constitute inadmissible hearsay. Therefore, the district court did not err in admitting the footage or allowing Sgt. Barrere to testify about its contents.

Similarly, we do not find that the district court erred in allowing Sgt. Barrere to testify about the timestamps depicted in the footage. At trial, Sgt. Barrere testified that the murder had occurred the week Daylight Savings Time ended and that some of the surveillance footage he collected had not been adjusted to represent the time change. He explained his process for determining the correct timestamps for the footage, which involved calculating the time based on other evidence he collected during his investigation. Based on the gathered evidence and his calculations, Sgt. Barrere concluded that Mr. Griffin could not have been the perpetrator because he was nowhere near the crime scene at the approximate time the murder occurred. Again, an officer can testify about the actions he took in his investigation of a crime. *State in Interest of K.B.*, 2023-0409, p. 32, 372 So. 3d at 885. Further, the defense had an opportunity to cross-examine Sgt. Barrere about his calculations on the timestamps. Given all this, we find this assigned error to be meritless.

### Pro Se Error No. 4: Whether the district court erred in allowing the State to use an undisclosed law enforcement data base and out-of-court statements at trial

Defendant's fourth *pro se* assignment of error attacks Sgt. Barrere's testimony regarding the use of the GeoTime software and TLO database to locate Defendant's and Devall's location around the time of Ms. Veal's murder. At trial, Sgt. Barrere testified that the cell phone records received during his investigation were placed into GeoTime, and the program produced a report depicting which cell towers were pinged by the phones at various times throughout the night. From this report, Sgt. Barrere was able to determine that Defendant's and Devall's phones were near the location of the murder. On appeal, Defendant objects on the basis that he was deprived of the right to confront the analyst who generated the

database results and because the State did not disclose the use of the database to the defense prior to trial, rendering his counsel ineffective in preparing a defense.

As this involves an evidentiary matter, we review the district court's ruling for an abuse of discretion. *Wright*, 2011-0141, pp. 10-11, 79 So. 3d at 316. Defendant's argument requiring the person who used the databases and generated the results to testify rings similar to previously rejected arguments. *See State v. Morgan*, 2012-2060, pp. 13-15 (La. App. 1 Cir. 6/7/13), 119 So. 3d 817, 826-27 (holding that a detective could give lay opinion testimony regarding the cell phone location data he received from third-party cellular service companies); *see also State v. Jackson*, 2015-0809, pp. 20-22 (La. App. 4 Cir. 5/25/16), 193 So. 3d 425, 437-39 (holding that a detective did not need to be an expert to testify regarding the location of various calls made by the defendant based on the information he received from third-party cellular providers); *State v. Stewart*, 2024-0454, pp. 23-25 (La. App. 4 Cir. 5/14/25), ___ So. 3d ___, 2025 WL 1414856 at *11-12 (rejecting the argument that a detective had to be qualified as an expert or have analyzed the raw cellular data in order to testify about the contents of a report on a phone's location). Further, as already discussed, officers are allowed to testify regarding the information they receive in the course of their investigation. *State in Interest of K.B.*, 2023-0409, p. 32, 372 So. 3d at 885. In keeping with the jurisprudence, and given the fact Sgt. Barrere was testifying about his investigation, we do not find the district court abused its discretion in allowing him to testify about the cellular location data results.

In regards to Defendant's argument about the State's failure to disclose the report to his defense counsel, this argument was made before the district court at trial. While the State admitted it had not produced the GeoTime report itself, it

16

represented that the police report, which had been provided prior to trial, contained all the information used. The district court allowed the State to lay a foundation as to how Sgt. Barrere received the report and the factual information the report provided. Defense counsel also questioned Sgt. Barrere about the GeoTime and TLO databases on cross-examination. Thus, we do not find the district court abused its discretion in allowing Sgt. Barrere to testify about the report.[10]

***Pro Se Error No. 6: Whether the district court erred in allowing a detective to offer lay opinion testimony regarding the presence or availability of DNA evidence***

Defendant's sixth *pro se* error concerns Sgt. Hiatt's testimony on re-direct examination as to the collection of DNA evidence from the crime scene. On re-direct, the State questioned Sgt. Hiatt as to why some ballistic evidence may or may not have been tested for DNA. Defense counsel objected on the basis that Sgt. Hiatt is not an expert on DNA testing.

The district court has the discretion to determine whether opinion testimony will be received into evidence as lay or expert testimony. *State v. Handy*, 2016-1071, p. 23 (La. App. 4 Cir. 9/13/17), 226 So. 3d 1182, 1198 (citation omitted). On appeal, the reviewing court must determine (1) whether "the testimony [was] speculative opinion evidence or simply a recitation of or inferences from facts based upon the witness' observations; and (2) if erroneously admitted, [whether] the testimony [was] so prejudicial to the defense as to constitute reversible error." *Id*. (citation omitted). Generally, a witness who is not testifying as an expert may give an opinion on matters that are rationally based on his perception and helpful in facilitating a clear understanding of his testimony or determining a fact in issue.

---

[10] We pretermit any substantive discussion regarding Defendant's ineffective assistance of counsel argument, as such a claim is best addressed in a post-conviction proceeding and not on an appeal. *State v. Watson*, 2000-1580, p. 4 (La. 5/14/02), 817 So. 2d 81, 84.

La. C.E. art. 701. Furthermore, "[i]t is well-settled that a law officer may testify as to matters within his personal knowledge acquired through experience without first being qualified as an expert." *Handy*, 2016-1071, p. 23, 226 So. 3d at 1198 (citing *Jackson*, 2015-0809, p. 20, 193 So. 3d at 437-38).

A review of Sgt. Hiatt's testimony reveals that he did not offer an expert opinion on DNA evidence or testing. When defense counsel objected, the district court ruled that Sgt. Hiatt could testify as to why certain evidence was not submitted for DNA testing. Sgt. Hiatt's final answer was that he did not know why certain evidence was not submitted. Sgt. Hiatt's testimony was based on his knowledge as an officer about the investigation and did not stray into the realm of an expert opinion. Therefore, we find Defendant's argument to be meritless.

***Pro Se Error No. 7: Whether the district court erred in allowing the prosecution to suggest in closing argument that a co-defendant had exclusive knowledge about the case***

Defendant's last *pro se* assignment of error relates to the State's closing rebuttal argument. Defendant contends that the prosecutor improperly implied that, because Devall knew about certain evidence, he had exclusive, personal knowledge about the crime.

Louisiana Code of Criminal Procedure article 774 confines closing arguments "to [the] evidence admitted, to the lack of evidence, to conclusions of fact that the [S]tate or defendant may draw therefrom, and to the law applicable to the case." Prosecutors are typically allowed a wide latitude in choosing their closing argument tactics, and the district court has broad discretion in controlling the scope of the parties' closing arguments. *State v. Casey*, 1999-0023, p. 17 (La. 1/26/00), 775 So. 2d 1022, 1036. As such, an appellate court cannot reverse a

conviction unless it is thoroughly convinced that the improper argument influenced the jury and contributed to the jury verdict. *Id*. (citation omitted).

A review of the closing argument reveals that the prosecutor did not lie when he argued Devall had knowledge about a piece of information about the night of the murder. This information was that Devall and Defendant had cleaned Ms. Veal's car after the murder. The record shows that in 2018 Devall had relayed to the police that he had made a call to his cousin so that he and Defendant could get supplies to clean Ms. Veal's car. Sgt. Barrere testified at trial that the discovery packet given to Devall in 2018 did not contain the police's suspicions that the car had been cleaned. The police did not obtain footage of Devall and Defendant cleaning the car until 2022. Thus, the prosecutor did not lie or mislead the jury in his closing argument, and this assigned error lacks merit.

### DECREE

For the above reasons, we affirm Defendant's convictions. We remand this case back with instructions for the district court to (1) edit the minute entry to reflect Defendant was found not guilty on Count 3; (2) edit the minute entry to remove the restrictions on Defendant's sentences for Counts 2 and 4; and (3) transmit notice of the amended sentences for Counts 2 and 3 to the appropriate authorities pursuant to La. C.Cr.P. art. 892(B)(2) and the Department of Corrections' legal department.

### CONVICTIONS AFFIRMED; REMANDED WITH INSTRUCTIONS